## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| EUGENE BATEN; CHESTER WILLIS; CHARLETTE PLUMMER-WOOLEY; BAKARI SELLERS, CORY C. ALPERT; and BENJAMIN HORNE, <br><br><br> Plaintiffs, <br><br> v. <br><br> HENRY MCMASTER, in his official capacity as Governor of the State of South Carolina; MARK HAMMOND, in his official capacity as Secretary of State of the State of South Carolina; the SOUTH CAROLINA ELECTION COMMISSION; BILLY WAY Jr., in his official capacity as a Chair of the Election Commission; MARK BENSON, in his official capacity as a Commission Member of the Election Commission; MARILYN BOWER, in her official capacity as a Commission Member of the Election Commission; E. ALLEN DAWSON, in his official capacity as a Commission Member of the Election Commission; NICOLE SPAIN WHITE, in her official capacity as a Commission Member of the Election Commission, <br><br><br> Defendants. | <br><br><br><br><br><br> Case No.    2:18-cv-00510-PMD |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

## NATURE OF THE ACTION

1.     The predominant method in America for counting votes in presidential elections violates the United States Constitution; it also distorts presidential campaigns, facilitates targeted outside interference in our elections, discriminates against racial and other minority voters, and ensures that a substantial number of citizen voters are disenfranchised when their votes are tallied in early November, only to be discarded when it really counts in mid-December.

2.     The Constitution assigns to presidential "Electors" the vote to choose the President and Vice-President.  U.S. Const. art. II, § 1.  States determine how those Electors are selected. South Carolina, like 47 other states and the District of Columbia, has decided to select Electors on a winner take-all ("WTA") basis, whereby the political party of the leading candidate among South Carolina's voters selects every Elector, with the vote of every other South Carolina citizen rendered meaningless by receiving no Elector directly or through a political party.  In 2016, for example, President Donald Trump received 54.94% of the vote in South Carolina, yet he received every single electoral vote from South Carolina.  Likewise, Secretary Hillary Clinton received 40.67% of the vote in South Carolina, but received none of the electoral votes from South Carolina.

3.     This magnification of certain votes and cancellation of all others is required by South Carolina law.  Under South Carolina's WTA method of selecting Electors, the party of the presidential candidate who wins more votes in the state than any other candidate is awarded all of South Carolina's nine Electors.  *See* S.C. Code § 7-19-70; *see also* National Archives and Records Administration, *Frequently Asked Questions*, https://www.archives.gov/federal-register/electoral-college/faq.html#wtapv (last visited Feb. 15, 2018) ("The District of Columbia and 48 states have a winner-takes-all rule for the Electoral College.  In these States, whichever candidate receives a majority of the popular vote, or a plurality of the popular vote (less than 50 percent but more than any other candidate), takes all of the state's Electoral votes.").

2

4.      The WTA method gives one candidate's party all of the Electors, regardless of whether the winning candidate has garnered only 38.09% of the popular vote in South Carolina, as Richard Nixon did in 1968, or as much as 96.56%, as John Davis did in 1924, or as few as 4,922 more votes than the next vote-getter, as Adlai Stevenson did in 1952, or as many as 300,016 more votes, as Donald Trump did in 2016.  Either way, the vote of each and every citizen voter is cancelled when the final direct election for President takes place unless it is cast for the winning candidate.  This includes as many as 855,373 South Carolina citizens who voted for Hillary Clinton in 2016.

5.      In South Carolina, it is Democrats and African-American voters who are effectively disenfranchised by the WTA system of selecting Electors.  In each of the last ten presidential elections the candidate who won South Carolina and received all of South Carolina's Electors has been a Republican and has not been the preferred candidate for African-American voters.  In those ten presidential elections, 5,937,650 votes were cast for the Democratic candidate in South Carolina, but none of the 82 South Carolina Electors were awarded to the Democratic candidate.

6.      This problem is not unique to South Carolina; it is also not unique to Democrats, as the same phenomenon occurs in reverse in heavily Democratic states where votes for the Republican candidate for President are systemically discarded before the final direct election for President.

7.      Thus, under the WTA system, many South Carolinians have been and will continue to be denied their constitutional right to an equal vote in the presidential election.

8.      The WTA system also perpetuates racial discrimination in voting and the dilution of minority voting power in violation of the Voting Rights Act of 1965, as amended in 1982 (the "Voting Rights Act").

9.     The WTA system also weakens the influence of South Carolina in presidential campaigns generally.  In particular, WTA leads presidential campaigns to focus on "battleground" states that in 2016 together represented only 35% of voters and did not include South Carolina. George Pilsbury & Julian Johannesen, Nonprofit VOTE, *America Goes to the Polls 2016: A Report on Voter Turnout in the 2016 Election*, at 12 (Mar. 16, 2017), *available at* http://www.nonprofitvote.org/documents/2017/03/america-goes-to-the-polls-2016.pdf/. Accordingly, presidential campaigns largely do not focus on the citizens of South Carolina.  In fact, just four battleground states—Florida, North Carolina, Ohio and Pennsylvania—saw 71% of campaign advertising spending and 57% of candidate appearances; the top 14 battleground states[1] saw 99% of advertising spending and 95% of candidate appearances. *Id.* at 7, 12.  WTA therefore causes candidates for President and Vice President to give disproportionate attention to an unrepresentative subset of the country, ultimately giving that unrepresentative subset outsized political influence.  Under such circumstances, the presidential election does not reflect or include the voices of the entire nation, including individuals in South Carolina.

10.     Finally, the WTA system distorts presidential campaigns and facilitates outside interference in our elections.  In close elections, WTA makes it much easier and much more likely for a very small number of voters in a few predictable battleground states to determine the final electoral result than would be the case with a system of proportional selection of Electors. This increased vulnerability gives the Court added reason to ensure that the current system satisfies the requirements of the Constitution.

---

[1]  The 14 battleground states in the 2016 presidential election were assumed to be Arizona, Colorado, Florida, Georgia, Iowa, Maine, Michigan, Nevada, New Hampshire, North Carolina, Ohio, Pennsylvania, Virginia, and Wisconsin.

11. This lawsuit is a challenge to the WTA method selected by South Carolina. As established by longstanding Supreme Court precedent, that exercise of state discretion remains subject to Constitutional norms, including the First and Fourteenth Amendments, as well as Section 2 of the Voting Rights Act.

12. To be clear, this lawsuit is not a challenge to the Electoral College, which is mandated by the Constitution. Instead, it is a challenge to the decision of South Carolina to award and select Electors on a WTA basis. The Constitution does not address how states should select Electors, and it certainly does not require WTA. To the contrary, as shown below, WTA is inimical to the long-established principle of "one person, one vote," and thereby violates the fundamental constitutional right to vote, as well as other constitutional and statutory rights.

13. Plaintiffs seek (1) a declaratory judgment that the WTA provisions of South Carolina's election code, *see* S.C. Code § 7-19-70, violate the First and Fourteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act; and (2) an order permanently enjoining the use of the WTA method (or other non-representational methods, such as selection by Congressional District vote) of selecting Electors in presidential elections.

14. WTA violates the Fourteenth Amendment because it counts votes for a losing presidential candidate in South Carolina only to discard them in determining Electors who cast votes directly for the presidency. Put differently, the WTA system unconstitutionally magnifies the votes of a bare plurality of voters by translating those votes into an entire slate of presidential Electors, all of whom support the nominee of a single political party—while, at the same time, the votes cast for all other candidates are given no effect. Accordingly, in the last five presidential elections, at least 40% of South Carolina voters cast a vote for the candidate that did not win the popular vote in South Carolina, and those voters thereby effectively had their votes cancelled.

Their votes were completely irrelevant to how the Electors representing South Carolina voted in the Electoral College.  WTA thus treats South Carolina citizens who vote for a losing candidate in an arbitrary and disparate manner in clear violation of the principle of "one person, one vote."

15.     In addition, WTA violates the First Amendment because of the burdens that it places on the right of association and on the right to have a voice in presidential elections through casting a vote.  There is no state interest that remotely outweighs these burdens.  Again, at least 40% of voters in the last five presidential elections—nationwide and in South Carolina—have voted for a losing candidate, and none of their votes have counted in the final direct election.  This trend will likely continue.

16.     The WTA system of selecting Electors also violates Section 2 of the Voting Rights Act.  South Carolina has a long and well-documented history of discrimination against African Americans in voting, voter registration, and other forms of participation in the political process.  That history has included the manipulation of the Electoral College in an attempt to defeat civil-rights legislation and the use of at-large voting districts to dilute or eliminate the voting power of African Americans.  It has also manifested itself in significant racial disparities in education, employment, health, housing, income, transportation, and incarceration.

17.     The WTA system of selecting Electors is in line with that history and works in the same way as an at-large voting district.  Despite the fact that South Carolina has nine Electors and African Americans represent over a quarter of the voting age population of the state, the WTA system allows white voters to usually—if not always—defeat all Electors slated for African-American preferred candidates.  Indeed, African-American voters in South Carolina have not had a single Elector slated for their preferred candidate in the last four decades.

18.     Under alternative, more democratic systems of selecting Electors, African Americans in South Carolina are sufficiently numerous, geographically compact, and politically cohesive to have an Elector for their preferred candidate in *each* presidential election.

19.     Continuation of the WTA system will ensure that the vast majority of African-American votes for the President of the United States will remain meaningless in South Carolina. This, in turn, will continue to dampen incentives for African Americans in South Carolina to participate in the presidential political process and will diminish presidential candidates' incentives to campaign for the votes of African-American citizens of South Carolina.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction based upon 28 U.S.C. § 1343(a)(3) & (4) and 28 U.S.C. § 1331 for causes of action arising from 52 U.S.C. §§ 10301, *et seq.*  Subject matter jurisdiction for Plaintiffs' claims under the First and Fourteenth Amendments to the United States Constitution exists under 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

21.     Venue is proper in this Court under 28 U.S.C. § 1391(b).

## PARTIES

22.     Because of South Carolina's WTA method of selecting Electors, each of the individual Plaintiffs listed below ("Individual Plaintiffs") has suffered, and will again suffer, an injury that comes from lacking any meaningful representation in the final vote count for the President (and Vice President) of the United States.  In particular, because the Individual Plaintiffs have voted for, and will vote for, the democratic candidate for President in South Carolina, they have been, and will be again, deprived of the right to have their votes counted equally and meaningfully toward the election of the President.

23.    Plaintiff Eugene R. Baten lives in Sumter, South Carolina, where he is registered to vote.  Mr. Baten is an African American and is an elected Democratic Councilman in Sumter who has voted for the Democratic presidential candidate in every presidential election in South Carolina since 1970.  He plans to remain a permanent resident of Sumter, South Carolina, where he will continue to vote in future presidential elections for the Democratic candidate.

24.    Plaintiff Chester Willis lives in Goose Creek, South Carolina, where he is registered to vote. Mr. Willis has voted for the Democratic presidential candidate in every presidential election since 1976. He plans to remain a permanent resident of Goose Creek, South Carolina, where he will continue to vote in future presidential elections for the Democratic candidate.

25.    Plaintiff Charlette Plummer-Wooley lives in North Augusta, South Carolina, where she has been registered to vote since 1992. She is African American and has voted for the Democratic presidential candidate in every presidential election since 2004.  She plans to remain a permanent resident of North Augusta, South Carolina, where she will continue to vote in future presidential elections for the Democratic candidate.

26.    Plaintiff Bakari Sellers lives in Demark, South Carolina, where he has registered to vote.  He is African American and has voted for the Democratic presidential candidate in South Carolina presidential elections since 2008.  He plans to remain a permanent resident in the 6th Congressional District of South Carolina where he will continue to vote in future presidential elections for the Democratic candidate.

27.    Plaintiff Cory C. Alpert lives in Columbia, South Carolina, where he is registered to vote.  Mr. Alpert has voted in every national, state, and local election since he was 18, including in 2016 when he cast a ballot in the presidential election for the Democratic candidate.  Mr. Alpert

plans to remain a permanent resident of South Carolina, where he will continue to vote in future presidential elections for the Democratic candidate.

28.    Plaintiff Benjamin Horne lives in Greenville, South Carolina, where he is registered to vote.  He voted for the Democratic presidential candidate in the last three presidential elections, including in South Carolina in 2016. He plans to remain a permanent resident of South Carolina, where he will continue to vote in future presidential elections for the Democratic candidate.

29.     Defendant Henry Dargan McMaster is the Governor of the State of South Carolina and is sued in his official capacity for declaratory and prospective injunctive relief to prevent a violation of federal constitutional and statutory rights.  Governor McMaster is the supreme executive authority of South Carolina, S.C. Const. art. IV, § 1, and is required to communicate certificates of appointment of Electors and to deliver those certificates to the Electors. S.C. Code § 7-19-70.  Defendant McMaster must also "communicate" to the "Archivist of the United States a certificate of such ascertainment of the electors appointed, setting forth the names of such electors and the canvass or other ascertainment under the laws of such State of the number of votes given or cast for each person for whose appointment any and all votes have been given or cast".  3 U.S.C. § 6.  In these circumstances, Governor McMaster has no immunity from suit.

30.    Defendant Mark Hammond is the Secretary of State of South Carolina and is sued in his official capacity for declaratory and prospective injunctive relief to prevent a violation of federal constitutional and statutory rights.  Mr. Hammond is responsible for certifying Electors to the Governor of South Carolina for elections of the President and Vice President of the United States.  S.C. Code § 7-19-70.  In these circumstances, Mr. Hammond has no immunity from suit.

31.    The South Carolina Election Commission "shall, ex officio, constitute the Board of State Canvassers." S.C. Code § 7-17-210.  The Election Commission, as the Board of Canvassers,

must state the number of votes given for "electors for President and Vice-President," *id.* at § 7-17-240, and must then "determine and declare what persons have been duly elected" as Electors.  *Id.* at § 7-17-250.

32.    Defendant Billy Way Jr. is a Commission Member of the South Carolina Election Commission, and serves as its Chair, and is sued in his official capacity for declaratory and prospective injunctive relief to prevent a violation of federal constitutional and statutory rights.  In these circumstances, Mr. Way has no immunity from suit.

33.    Defendant Mark Benson is a Commission Member of the South Carolina Election Commission, and is sued in his official capacity for declaratory and prospective injunctive relief to prevent a violation of federal constitutional and statutory rights.  In these circumstances, Mr. Benson has no immunity from suit.

34.    Defendant Marilyn Bowers is a Commission Member of the South Carolina Election Commission and is sued in her official capacity for declaratory and prospective injunctive relief to prevent a violation of federal constitutional and statutory rights.  In these circumstances, Ms. Bowers has no immunity from suit.

35.    Defendant E. Allen Dawson is a Commission Member of the South Carolina Election Commission and is sued in his official capacity for declaratory and prospective injunctive relief to prevent a violation of federal constitutional and statutory rights.  In these circumstances, Mr. Dawson has no immunity from suit.

36.    Defendant Nicole Spain White is a Commission Member of the South Carolina Election Commission and is sued in her official capacity for declaratory and prospective injunctive

relief to prevent a violation of federal constitutional and statutory rights.  In these circumstances, Ms. White has no immunity from suit.

## WTA IS NOT MANDATED BY THE CONSTITUTION

37.    Under Article II, Section 1 of the U.S. Constitution, states are given authority to determine the manner of selecting Electors.  That provision of the Constitution states: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" to choose a President and Vice President.

38.    "When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore*, 531 U.S. 98, 104 (2000).

39.    The Constitution grants "extensive power to the States to pass laws regulating the selection of electors.  But the Constitution is filled with provisions that grant Congress or the States specific power to legislate in certain areas; these granted powers are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution."  *Williams v. Rhodes*, 393 U.S. 23, 29 (1968).

40.    South Carolina has chosen the WTA system of selecting Electors for presidential races.  Neither Article II, Section 1 of the U.S. Constitution, nor any other constitutional provision, compels South Carolina to make that choice.

## SOUTH CAROLINA'S METHOD OF
## SELECTING ELECTORS IS UNCONSTITUTIONAL

41.    South Carolina's WTA method of selecting Electors violates the Fourteenth Amendment's command that no State may "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1. It also violates the First Amendment by

11

unduly burdening the rights of the citizens of South Carolina to associate and to effectively express their political preferences through voting. *See* U.S. Const. amend. I, § 1.

43. Under Article II, Section 1 of the United States Constitution, each state is required to appoint the same number of Electors as it has Senators and Representatives. U.S. Const. art. II, § 1. These Electors are tasked with electing the President and Vice President of the United States. *Id.*

43. While Article II, Section 1 grants the states "extensive power" to "pass laws regulating the selection of electors," it cannot be "thought that the power to select electors could be exercised in such a way as to violate express constitutional commands that specifically bar States from passing certain kinds of laws." *Rhodes*, 393 U.S. at 29. The Supreme Court has made clear "that no State can pass a law regulating elections that violates the Fourteenth Amendment's command that No State shall deny to any person the equal protection of the laws." *Id.* (internal quotation marks and ellipses omitted). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right." *Wesberry v. Sanders*, 376 U.S. 1, 17–18 (1964).

44. In South Carolina, as in the rest of the country, citizens do not vote directly for President. Instead, they vote for Electors, who then cast their votes in a direct election for President. South Carolina has chosen to adopt a WTA system for determining Electors. Under this system, all of South Carolina's nine Electors are members of the political party that nominated the candidate that wins the popular vote in the state. The consequence of this system is to give no effect to the votes of citizens who voted for a losing candidate in South Carolina in the tabulation

of the final vote for President.  South Carolina's WTA system violates the "one person, one vote" principle, long enshrined in Fourteenth Amendment Supreme Court jurisprudence, because votes for a losing presidential candidate are counted in South Carolina only to be discarded when another candidate wins more votes in South Carolina.  In other words, if an individual does not vote for the winning candidate in South Carolina, that person's vote translates into no representation in the state's multi-member Electoral College delegation.

A.    **The WTA Method of Determining Electors Violates the "One Person, One Vote" Principle and the Fourteenth Amendment.**

45.    In 2016, 40.67% of voters in South Carolina voted for the Democratic candidate for President.  Despite this significant bloc of support, every single Democratic vote was systemically discarded under the WTA method of selecting Electors.

46.    Such systemic discarding of votes occurs in election after election in South Carolina.  In the last five presidential elections, the Democratic candidate for President received at least 40% of the vote—40.67% in 2016 (855,373 votes), 44.09% in 2012 (865,941 votes), 44.90% in 2008 (862,449 votes), 40.91% in 2004 (661,699 votes), and 40.9% in 2000 (566,039 votes).  In each of these elections, the entirety of South Carolina's Electors went to the Republican candidate, cancelling the votes of Democratic voters.  Combined, South Carolina has discarded nearly 4 million presidential votes since the year 2000.  During the same period, Republican candidates received nearly 5 million popular votes, but those votes were unduly magnified in each election and translated into the election of 42 total Electors, and 42 total electoral votes cast for Republican presidential nominees.  During the same period, South Carolina selected zero Democratic Electors.

47.    A similar pattern holds over the last ten presidential elections.  In the presidential elections from 1980-1996, the Democratic candidate received between 36% and 48% of the vote

13

in South Carolina, but the state selected zero Democratic Electors. In the aggregate, from 1980 to 1996, over two million votes in South Carolina were systemically discarded.

48.     The inequitable nature of the current system of determining Electors has been recognized by both major parties. As Saul Anuzis, the former Chairman of the Michigan Republican Party, stated, "This is, to me, a nonpartisan issue. It's a question of what is the right way to elect a president. In every other office in the land, we elect the person who gets the most votes, from dog catcher to governor." Eliza Newlin Carney, *GOP Nonprofit Backs Electoral College*, Roll Call (Dec. 7, 2011, 12:57 PM), http://www.rollcall.com/news/GOP-Nonprofit-Backs-Electoral-College-210872-1.html.

49.     Democrats also share this view. For example, Representative James Clyburn, when writing on the WTA system of selecting Electors, stated, "My position has always been that winner-take-all elections trample on the variety of voices in our diverse country. Winner-take-all elections by their very nature mean that the highest vote getter wins, even if the margin of victory is only one vote." James Clyburn, *Representative James Clyburn: Mend It*, The American Prospect (Dec. 19, 2001), http://prospect.org/article/flunking-electoral-college. Similarly, retired Senate Minority Leader Harry Reid called the Electoral College "very undemocratic." Chris Sanchez, *'UNDEMOCRATIC': Harry Reid goes in on the Electoral College*, Business Insider (Dec. 13, 2016, 10:54 PM), http://www.businessinsider.com/electoral-college-undemocratic-harry-reid-trump-hillary-clinton-2016-12.

50.     The "one person, one vote" principle means that South Carolina may not "value one person's vote over that of another." *Bush*, 531 U.S. at 104–05. The Supreme Court laid the groundwork for the "one person, one vote" principle over fifty years ago in *Baker v. Carr*, 369 U.S. 186 (1962), in which it recognized a right to vote "free of arbitrary impairment by state action"

whether "such impairment resulted from dilution by a false tally, or by a refusal to count votes from arbitrarily selected precincts, or by a stuffing of the ballot box." *Id.* at 208 (internal citations omitted).

51.    "One person, one vote" was first articulated the following year in *Gray v. Sanders*, 372 U.S. 368 (1963), which involved a challenge to Georgia's system for allocating votes in the primary for statewide office.  The Court invalidated Georgia's system because the candidate winning the popular vote in the county under that system would receive "the entire unit vote of that county," with "other votes for a different candidate being worth nothing and *being counted only for the purpose of being discarded*." *Gray*, 372 U.S. at 381 n.12 (emphasis added).  In so holding, the Court stressed: "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." *Id.* at 381.

52.    "Over the ensuing decades, the Court has several times elaborated on the scope of the one-person, one-vote rule." *Evenwel v. Abbott*, 136 S. Ct. 1120, 1124 (2016).  The Supreme Court applied "one person, one vote" to invalidate a scheme for the apportionment of seats in the Alabama legislature, *see Reynolds v. Sims*, 377 U.S. 533, 563 (1964) (applying "one person, one vote" to strike down method for counting votes and highlighting that "Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable"), and to a system placing Electors for a new party on the ballot, *see Moore v. Ogilvie*, 394 U.S. 814, 819 (1969) (concluding "The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government").

53.    Only one case involving the constitutionality of a WTA system in the context of presidential elections has reached the Supreme Court and, in that case, the Court summarily affirmed the lower court's decision without an opinion. *Williams v. Va. State Bd. of Elections*, 288 F. Supp. 622 (E.D. Va. 1968), *summarily aff'd without opinion,* 393 U.S. 320 (1969).  In *Williams*, the plaintiffs brought an Equal Protection Clause challenge to Virginia's WTA system for selecting Electors before a three-judge panel.  The panel acknowledged "discrimination against the minority voters" because "once the electoral slate is chosen, it speaks only for the element with the largest number of votes." *Id.* at 627.  It nonetheless dismissed the complaint, ruling that "in a democratic society the majority must rule, unless the discrimination is *invidious.*" *Id.* (emphasis added).  The panel found that "No such evil has been made manifest" and dismissed the complaint. *Id.*

54.    To the extent that there was once an invidiousness requirement to a Fourteenth Amendment claim involving violation of the "one person, one vote" principle, the Court's decision in *Bush v. Gore*, 531 U.S. 98 (2000) removed it.  There, the Supreme Court invalidated Florida's process for recounting votes in the 2000 presidential election for violating the "one person, one vote" principle.  Notably, there was no suggestion that any unequal treatment of votes under Florida's process was invidious. *See Bush*, 531 U.S. at 105; *see also id.* at 104 ("When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter."); *id.* at 107 (holding that "'the idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government.'") (quoting *Moore*, 394 U.S. at 819 (alteration omitted)).

B.    **The WTA Method of Determining Electors Violates the Right to Associate Protected by the First and Fourteenth Amendments to the United States Constitution.**

55.    The right to associate is protected under the First and Fourteenth Amendments.  "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."  *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958).

56.    The Supreme Court has long held that "political belief and association constitute the core of those activities protected by the First Amendment."  *Elrod v. Burns*, 427 U.S. 347, 356 (1976).  The "right of individuals to associate for the advancement of political beliefs" and "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively" are "overlapping" rights that "rank among our most precious freedoms."  *Rhodes*, 393 U.S. at 30.

57.    South Carolina's WTA selection of Electors deprives Plaintiffs of their First and Fourteenth Amendment associational rights based solely on Plaintiffs' political association and expression of political views at the ballot box.

58.    South Carolina's WTA selection of Electors discards Plaintiffs' votes for President, limiting Plaintiffs' ability to express their political preference.  When Plaintiffs express their political preference through a vote for the Democratic or third-party candidate, South Carolina's WTA selection of Electors ensures that Plaintiffs' voices are not heard and Plaintiffs' votes do not count toward the selection of Electors.  Plaintiffs each become an "unequal participant in the decisions of the body politic."  *Whitford v. Gill*, 218 F. Supp. 3d 837, 883 (W.D. Wis. 2016).

59.    In 1986, the Supreme Court held that a state law restricting access to primary voting to those who were registered members of the party was unconstitutional because it limited "the Party's associational opportunities at the crucial juncture at which the appeal to common principles

17

may be translated into concerted action, and hence to political power in the community." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 216 (1986). The associational rights of Plaintiffs and other Democrats and third-party voters in South Carolina are similarly restricted due to South Carolina's WTA selection of Electors. Plaintiffs' votes are discarded "at the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community." *Id.*

60. The WTA system also limits Plaintiffs' associational rights because it dilutes the power of the Democratic and third-party voters in South Carolina. As a result, candidates from major political parties rarely hold campaign events in South Carolina once they are selected by their parties in the primary. This results in a reduced opportunity for all South Carolinians to interface with and petition the candidates for major political parties in person, and "to express their ideas, hopes, and concerns to their government and their elected representatives" as is also protected by the Petition Clause of the First Amendment. *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011).

61. The impact of South Carolina's WTA system is felt nationally as well as locally. Indeed, "in the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest." *Anderson v. Celebrezze*, 460 U.S. 780, 794–95 (1983) (footnote call omitted). "Moreover, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States" and burdens on associational rights may place "a significant state-imposed restriction on a nationwide electoral process." *Id.* at 795.

62. South Carolina has "a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by

voters beyond the State's boundaries." *Id.*    And any regulation of such elections may not contravene constitutional rights.    *See id.* at 788 (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

63.    "When deciding whether a state election law violates First and Fourteenth Amendment associational rights," courts must "weigh the 'character and magnitude' of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).

64.    South Carolina's WTA selection of Electors poses a severe burden on Plaintiffs' associational rights that is not outweighed by any legitimate state interest.

**C.    The WTA System Makes United States Elections More Vulnerable to Outside Influences.**

65.    As government reports have concluded, "Russian intelligence accessed elements of multiple state or local electoral boards.  Since early 2014, Russian intelligence has researched US electoral processes and related technology and equipment."  U.S. Office of the Dir. of Nat'l Intelligence, Background to "Assessing Russian Activities and Intentions in Recent US Elections": The Analytic Process and Cyber Incident Attribution, at 3 (2017), https://www.dni.gov/files/documents/ICA_2017_01.pdf.    "Russia's effort to influence the 2016 US presidential election represented a significant escalation in directness, level of activity, and scope of effort compared to previous operations aimed at US elections."  *Id.* at 5.  Efforts from the outside to influence the outcome of United States elections strike at the core of our democracy.

66.    The current WTA system makes our election system more vulnerable to outside attacks, as prevailing under that system usually depends on gaining a majority in a handful of battleground states.  As one commentator explained: "It is true that our decentralized, precinct-by-

precinct system would make a coordinated national vote hack a massive undertaking.  But given that our elections usually come down to a few predictable states, swaying even a national election is not as hard a task as it once seemed.  Sowing chaos at the district or precinct level appears to be within hackers' current capabilities."  Suzanne Mello-Stark, *It's now clear US voting is hackable. Here are 6 things we must do to prevent chaos*, Vox (June 16, 2017, 10:50 AM), https://www.vox.com/the-big-idea/2017/6/16/15816510/voting-security-hacks-russia-georgia-election.

67.    Under a more equitable and constitutional method of selecting Electors, the risk of an outside influence changing the outcome of a presidential election is greatly reduced.  The votes of citizens in each state become meaningful and the outcomes of elections do not boil down to the winner of a few easily predictable states.

## SOUTH CAROLINA'S METHOD OF SELECTING ELECTORS VIOLATES THE VOTING RIGHTS ACT, SECTION 2

### A.    South Carolina Has a History of Voting Racial Discrimination.

68.    South Carolina has a long and well-documented history of racial discrimination against African Americans in voting, registration, and participation in the democratic process. That history has repeatedly been recognized by federal courts.  *See, e.g., United States v. Charleston Cty.*, 316 F. Supp. 2d 268, 282 (D.S.C. 2003) ("It is plain that African Americans have suffered a pronounced and protracted history of past discrimination,"  discussing evidence of discrimination against African Americans in South Carolina in employment, education, political participation, and voting), *aff'd sub nom. United States v. Charleston Cty.*, S.C., 365 F.3d 341, 353 (4th Cir. 2004); *United States v. Charleston Cty.*, 318 F. Supp. 2d 302, 322 (D.S.C. 2002) (noting that the "Defendants concede that Charleston County and the State of South Carolina have histories of official discrimination"); *Colleton Cty. Council v. McConnell*, 201 F. Supp. 2d 618, 634 (D.S.C.

2002) (noting that South Carolina has "the worst reputation for historical and ongoing discrimination against blacks"); *NAACP, Inc. v. City of Columbia, S.C.*, 850 F. Supp. 404, 421–422 (D.S.C. 1993) (noting that there was an "abundance of uncontroverted testimony about South Carolina's past history of discrimination affecting voting" and that discrimination in South Carolina has "been widely documented in numerous reported decisions in this district"), *aff'd as modified*, 33 F.3d 52 (4th Cir. 1994); *see also Rice v. Elmore*, 165 F.2d 387, 392 (4th Cir. 1947) (upholding a district court order forcing the South Carolina Democratic Party to allow African Americans to vote in its primaries), *cert. denied*, 333 U.S. 875 (1948).

69.     Until 2013, South Carolina was a "covered jurisdiction" under Section 5 of the Voting Rights Act, and thus met the formula set out under Section 4(b) of the Act for determining which states need more oversight.  *Shelby Cty., Ala. v. Holder*, 133 S. Ct. 2612, 2620 (2013).  Congress required "preclearance" for covered jurisdictions because they maintained literacy tests or other obstacles to voting and had low voter registration or turnout in the 1960s and early 1970s.  *Id.* at 2628.  Those factors, the Supreme Court explained, "are relevant to voting discrimination because of their long history as a tool for perpetrating the evil; a low voting rate is pertinent for the obvious reason that widespread disenfranchisement must inevitably affect the number of actual voters."  *South Carolina v. Katzenbach*, 383 U.S. 301, 330 (1966).

70.     As several courts have recognized, South Carolina's history of voting discrimination extends from before the Civil War to recent elections. *See Jackson v. Edgefield Cty., S.C. Sch. Dist.*, 650 F. Supp. 1176, 1180 (D.S.C. 1986) (discussing South Carolina's history of discrimination against African American in voting and in registering to vote since before the Civil War); *Charleston Cty.*, 316 F. Supp. 2d at 286 n.23 (noting that "the United States did put forward voluminous testimony concerning what it characterized as a consistent and more recent

pattern of white persons acting to intimidate and harass African-American voters at the polls during the 1980s and 1990s and even as late as the 2000 general election" and that "the Court agrees that there is significant evidence of intimidation and harassment").

71.     South Carolina also has a history of using the WTA method of selecting Electors to undermine civil-rights advancements.

72.     As one example, in February 1948, President Harry Truman announced a broad civil-rights agenda, later included in the Democratic Party platform, proposing several initiatives to combat discrimination against African Americans.  Nadine Cohodas, *Strom Thurmond and the Politics of Southern Change*, at 126–93 (1993).  South Carolina's Governor, Strom Thurmond, objected that Truman's proposals would undermine "the protection of the racial integrity and purity of the white and negro races alike," and vowed to use the "electoral college set up in the Constitution of the United States" to block Truman's efforts.  *Id.* at 133.  Thurmond planned to do so by being nominated for President in a separate convention of southern states and then taking advantage of South Carolina's and other southern states' WTA system of selecting Electors in order to force the election for President into the House of Representatives.  The WTA system would allow him to gain a far larger share of the total Electoral College than his share of the popular vote of the country, and southern lawmakers in the House could then soften civil-rights policies or elect a southern candidate.  *Id.*

73.     To eliminate any doubt as to his intentions, Thurmond declared in his acceptance speech at the southern convention that "there's not enough troops in the army to force the southern people to break down segregation and admit the Negro race into our theaters, into our swimming pools, into our homes, and into our churches."  *Id.* at 177.  As part of Thurmond's effort, the Democratic Party in four southern states, including South Carolina, nominated slates of Electoral

College delegates pledged to Thurmond, thereby abandoning their party's official nominee, Harry Truman. *Id.* at 181. Thurmond went on to win all four states by large margins, receiving all of their Electors. Although Truman was still able to win a sufficient amount of Electors to win the presidency, Thurmond's 39 Electors were almost enough to throw the election to the House of Representatives. Had Truman lost, for example, Texas and Georgia—both solidly Republican states today—he would have failed to receive a sufficient number of Electoral College votes. Overall, Thurmond won only 2.4% of the popular vote, but was able to take over 7% of the Electoral College votes because of the WTA system.

74.    South Carolina's history of discrimination also includes the documented use of at-large voting to dilute or eliminate the strength of African-American votes within a geographic area.

75.    In 2003, a United States District Court found that Charleston County's at-large system of electing its nine County Council members "denies African Americans, on account of their race and color, equal access to the Electoral and political process, in contravention of Section 2 of the Voting Rights Act." *Charleston Cty.*, 316 F. Supp. 2d at 307. The court found that the white voting-bloc of Charleston County was almost always able to defeat the African-American preferred candidate, despite the fact that the African-American population was sufficiently large and politically cohesive to make up "a majority in at least one of nine single-member districts in an illustrative plan for Charleston County Council." *Id.* at 276–77. The effect of the at-large process was that in over thirty years of elections, only three out of forty-one council members were African American. *Id.* at 274.

76.    South Carolina's WTA system works in the same way as the at-large voting district discussed in *Charleston Cty.*, 365 F.3d at 341. Both systems dilute the power of the African-American voting bloc by expanding the electorate to include more white voters. Both systems

deny "African Americans, on account of their race and color, equal access to the electoral and political process, in contravention of Section 2 of the Voting Rights Act." *Id.*

77.    Under South Carolina's WTA system, each vote for a presidential and vice-presidential candidate is counted as a vote for the "Electors of the party by which those candidates were nominated or the Electors of petition candidates whose names have been filed with the Secretary of State." S.C. Code § 7-19-70. Nine Electors nominated by the party whose candidate wins at least a plurality of the statewide vote are permitted to cast electoral votes at the appointed date and time. No electors from any other party are permitted to cast any electoral vote.

78.    President Barack Obama, for example, won just under 45% of South Carolina's vote for the President in 2008, but received zero of South Carolina's nine Electoral College votes.

79.    As a result of the WTA system of selecting Electors, African Americans in South Carolina have not had a single Elector for their preferred candidate for the last 40 years, despite the fact that they make up over a quarter of the voting age population in the state. By contrast, the votes of the white majority have been magnified, because Republican candidates have received 100% of the state's electoral votes in that same time period.

80.    Less discriminatory means of selecting Electors are readily available.

81.    As an example, South Carolina could select their Electors proportionally, giving each party a proportional number of the state's nine Electors based on the percentage of votes their candidate received in the statewide election.

82.    Under a proportional system, African Americans are sufficiently numerous, compact, and cohesive to win at least one Elector for their preferred candidate for each election.

**B.    South Carolina's WTA System Meets Each of the Requirements to Establish a Violation of Section 2 of the Voting Rights Act.**

83.    South Carolina's use of the WTA system meets each of the elements necessary to establish a violation of Section 2 of the Voting Rights Act: (1) the African-American population in South Carolina "is sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the African-American population in South Carolina "is politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986) (internal citation omitted).

> *Gingles Factor #1: South Carolina has a sufficiently large and compact minority population.*

84.    South Carolina has a sufficiently large and compact population of African Americans to win at least one Elector in a proportional system of selecting Electors or in other systems that do not result in the dilution of minority votes.

85.    According to the 2016 United States Census estimates, 27.5% of the population in South Carolina is African American.

86.    American Community Survey ("ACS") estimates for 2015 show that the voting age population in South Carolina is 27.1% African American.

87.    According to the South Carolina Election Commission, as of October 28, 2016, 27.6% of the registered voters in South Carolina are African American.

88.    ACS estimates for 2016 show that 57.2% of South Carolina's 6th Congressional District is African American.

89.    Census estimates for 2013 state that African Americans make up a majority of the population of South Carolina's Allendale, Bamburg, Fairfield, Hampton, Lee, Marlboro, Orangeburg, and Williamsburg counties.

90.    South Carolina's Election Commission reports that as of October 28, 2016, African Americans make up a majority of registered voters in South Carolina's Allendale, Bamburg, Fairfield, Hampton, Lee, Marion, Marlboro, Orangeburg, Sumter, and Williamsburg counties.

### Gingles Factor #2: South Carolina's African-American population is a politically cohesive minority voting bloc.

91.    Voting in South Carolina is highly racially polarized and African Americans in the state are politically cohesive.  For example, exit polls taken during the 2008 and 2016 presidential elections showed that African-American voters in South Carolina voted for the Democratic candidate at rates of 96% and 94%, respectively.  Nationwide exit polling for 2012 showed that 93% of African-American voters supported Barack Obama.

92.    Numerous courts have recognized that voting in South Carolina is highly racially polarized and that the white and African-American populations vote as separate, cohesive blocs. *See, e.g., Charleston Cty.*, 365 F.3d at 347 (noting that "the County concedes not only that its minority voters are sufficiently numerous and geographically compact to constitute a majority in a single-member district, but also that they are politically cohesive"); *Charleston Cty.*, 318 F. Supp. 2d at 322 ("'Voting in South Carolina continues to be racially polarized to a very high degree, in all regions of the state and in both primary elections and general elections.  Statewide, black citizens generally are a highly politically cohesive group and whites engage in significant white-bloc voting.'") (quoting *Colleton County Council,* 201 F.Supp.2d at 640–41); *Smith v. Beasley*, 946 F. Supp. 1174, 1202 (D.S.C. 1996) ("In South Carolina, voting has been, and still is, polarized

by race.  This voting pattern is general throughout the state and is present in all of the challenged

House and Senate districts in this litigation.").

### *Gingles Factor #3: South Carolina's white population votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.*

93.     As a result of the size of the white population and its political cohesiveness, white

voters in South Carolina usually vote sufficiently as a bloc to enable them to defeat the African-

American preferred candidate, including their minority preferred candidate for President.

According to Census estimates for 2016, the voting age population in South Carolina is 69.7%

white.

94.     Exit polls for the 2008 and 2016 presidential election showed that white voters in

South Carolina supported the Republican candidate at rates of 73% and 70%, respectively.  In

those years, the Republican candidate received 100% of the state's Electors.

95.     As a specific example, Barack Obama received over 90% of African-American

votes in South Carolina in 2008 and 2012 but was still unable to win a single Elector for the state.

96.     As stated above, despite the fact that African Americans make up over a quarter of

the voting age population in South Carolina, they have not had a single Elector for their preferred

candidate since 1976 when President Jimmy Carter won every southern state except for Virginia

and Oklahoma.

97.     Aside from Senator Tim Scott—who was originally appointed as a United States

Senator by a Republican Governor—South Carolina has never elected an African-American

representative to a state-wide office.

98.     Courts have recognized that white voters in South Carolina vote sufficiently as a

bloc to enable them to defeat the African-American preferred candidate.  *See e.g.*, *Charleston Cty.*,

316 F. Supp. 2d at 277 (reaffirming that "candidates of choice of African–American voters in

Charleston County Council contests are usually defeated as a result of white bloc voting"); *Colleton Cty. Council*, 201 F. Supp. 2d at 642 ("Minority voters are generally politically cohesive to a very high degree and, as a rule, the majority usually votes sufficiently as a bloc to defeat the minority's preferred candidate."); *Smith*, 946 F. Supp. at 1203.

### *Additional factors support a violation of Section 2 of the Voting Rights Act here*

99.     The "totality of the circumstances" supports a finding of racial discrimination in voting for the Presidency in violation of Section 2 of the Voting Rights Act.  52 U.S.C. § 10301(b).

100.     Numerous factors support the conclusion that African-American voters in South Carolina have less opportunity than their white counterparts to participate in the political process and to elect representatives of their choice.

101.     South Carolina has a long, judicially-recognized history of racial discrimination against African Americans in voting, registration, and participation in the democratic process.

102.     That history of racial discrimination has included the use of at-large voting districts, as well as instances where African Americans were barred from participating in choosing a candidate for general election.

103.     South Carolina's WTA system of selecting Electors works in the same way as an at-large district.  As a result, it enhances the opportunity for discrimination against African-American voters.

104.     Aside from one Senator who was originally appointed by a Republican Governor, South Carolina has never elected an African-American representative to a state-wide office, nor has it ever selected an Elector slated to an African-American candidate.

105.    The results of the South Carolina's history of discrimination can be seen in the significant racial disparities in education, employment, health, housing, income, transportation, and incarceration in South Carolina.

106.    Numerous courts have recognized socioeconomic disparities between the African American and white populations in South Carolina. *See e.g.*, *Charleston Cty.*, 318 F. Supp. 2d at 323 (noting that it was undisputed that "socioeconomic disparities divide white and black residents of Charleston County"); *Smith*, 946 F. Supp. at 1203 ("In the challenged House and Senate districts, there is a socio-economic gap between the average white citizen and the average black citizen. There is a larger percentage of blacks than whites below the poverty level; the household income of blacks is generally less than that of whites; unemployment is greater among blacks; and the level of formal education among blacks is less. There are more whites than blacks residing in married-couple households, and more blacks live in single-female households. More blacks than whites are without private means of transportation, and more whites than blacks own their own homes. Infant mortality is greater among blacks."); *Jackson*, 650 F. Supp. at 1188–89 ("Defendants do not substantially dispute that there are socio-economic disparities which have existed in the white and black community. Indeed, implicitly emphasized in the defendants' view that the inequality gaps on income, education, employment level and living conditions are narrowing at a faster rate in Edgefield County as they are compared to those of the State and of the National is their recognition that these circumstances of disproportionality still prevail.").

107.    Elected officials in South Carolina have historically shown a lack of responsiveness to the needs of the African-American community in the state. The racial disparities in education, employment, health, housing, income, transportation, and incarceration serve as evidence of that lack of responsiveness.

108.   Modern political campaigns in South Carolina and nationwide, including campaigns for the President of the United States, are still at times characterized by overt and subtle racial appeals.  As one of many examples, push polls and flyers in South Carolina during the 2000 presidential primary campaign implicitly and explicitly accused John McCain of fathering a "negro child" out of wedlock.  George W. Bush went on to win the primary election in South Carolina by eleven points.

109.   The policy reasons underlying the use of the WTA system of selecting Electors in South Carolina are tenuous.

110.   Overall, the WTA system of selecting Electors perpetuates a history of discrimination against African-American voters in South Carolina and makes it all the more difficult to address the results of that discrimination.  It dilutes African-American votes for the President of the United States; it dampens incentives for African Americans in South Carolina to participate in the electoral process; it diminishes presidential candidates' incentives to campaign for the votes of African-American citizens of South Carolina; and it impermissibly magnifies and multiplies the votes of the white majority.  It is therefore a violation of Section 2 of the Voting Rights Act.

## CAUSES OF ACTION

### Count I – Fourteenth Amendment to the United States Constitution

111.   Plaintiffs reallege and incorporate all prior paragraphs of this Complaint.

112.   South Carolina's WTA system for selecting Electors results in the votes of citizens who voted for a losing candidate in the state not being counted in the final direct election for President.  Accordingly, South Carolina's WTA method of determining Electors violates the "one person, one vote" principle and the Fourteenth Amendment to the United States Constitution.

113.    Unless enjoined by order of this Court, Defendants will continue to violate the Fourteenth Amendment to the United States Constitution by implementing the WTA method of selecting Electors.

### Count II – First and Fourteenth Amendments to the United States Constitution

114.    Plaintiffs reallege and incorporate all prior paragraphs of this Complaint.

115.    South Carolina's WTA system poses a severe burden on Plaintiffs' rights to associate and to effectively express their political preference through voting that is not outweighed by any legitimate state interest.  Accordingly, South Carolina's WTA method of determining Electors violates the First and Fourteenth Amendments to the United States Constitution.

116.    Unless enjoined by order of this Court, Defendants will continue to violate the First and Fourteenth Amendments to the United States Constitution by implementing the WTA method of selecting Electors.

### Count III – Section 2 of the Voting Rights Act (52 U.S.C. § 10301)

117.    Plaintiffs reallege and incorporate all prior paragraphs of this Complaint.

118.    The WTA system of selecting Electors in South Carolina results in the denial or abridgment of the right of African-American citizens in South Carolina to vote on account of race or color in violation of Section 2 of the Voting Rights Act.  52 U.S.C. § 10301.

119.    Under the totality of the circumstances, the WTA system of selecting Electors results in less opportunity for African-American citizens in South Carolina than their white counterparts "to participate in the political process and to elect representatives of their choice." *Id.* at § 10301(b).

120.    The WTA system of selecting Electors has a direct causal connection to the denial or abridgment of the right of African-American citizens in South Carolina to vote on account of race or color.

121.    Unless enjoined by order of this Court, Defendants will continue to violate Section 2 by implementing the WTA method of selecting Electors.

## ATTORNEYS' FEES

122.    In accordance with 52 U.S.C. § 20510 and 42 U.S.C. § 1988, Plaintiffs are entitled to recover reasonable attorney's fees, expenses, and costs.

## PRAYER FOR RELIEF

123.    WHEREFORE, Plaintiffs respectfully request that this Court:

a.  declare that South Carolina's current method of selecting Electors under S.C. Code Section 7-19-70, and any other related section, is unlawful because it (1) treats South Carolina citizens who vote for a losing candidate in an arbitrary and disparate manner in violation of the Fourteenth Amendment of the United States Constitution; (2) burdens these citizens' rights to associate and to express their political preference effectively through voting in violation of the First and Fourteenth Amendments to the United States Constitution; and (3) dilutes the voting strength of African-American voters in South Carolina in violation of Section 2 of the Voting Rights Act;

b.  declare that Plaintiffs' rights will be irreparably harmed without injunctive or declaratory relief from this Court;

c.  enjoin Defendants from selecting Electors under the challenged WTA system, or any other system that fails to treat each South Carolina citizen's vote for the President in an equal manner, including selection by Congressional District vote;

d.  set reasonable deadlines for state authorities to propose and then implement a method of selecting Electors that treats each South Carolina citizen's vote for the President in an equal manner, making clear that such a system *cannot* include selection by Congressional District vote;

e.  if state authorities fail to propose or implement a valid method of selecting Electors by the Court's deadlines, order a proportional method of distributing Electors, selecting a proportional number of Electors to each party, based on the number of votes each party's candidate receives statewide;

f.  adjudge all costs against Defendants, including reasonable attorneys' fees and costs;

g.  retain jurisdiction to render any and all further orders that this Court may deem necessary in order to ensure compliance; and

h.  grant any and all further relief to which Plaintiffs may show themselves to be entitled.

(signature page follows)

Respectfully submitted,

s/Richard A. Harpootlian
Richard A. Harpootlian (Fed. ID No. 1730)
Christopher P. Kenney (Fed. ID No. 11314)
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street
Post Office Box 1040
Columbia, South Carolina 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810
rah@harpootlianlaw.com
cpk@harpootlianlaw.com

Matt Herrington (*pro hac vice* forthcoming)
Roger E. Warin (*pro hac vice* forthcoming)
Joe R. Caldwell, Jr. (*pro hac vice* forthcoming)
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902
mherrington@steptoe.com
rwarin@steptoe.com
jcaldwell@steptoe.com

Randall L. Allen (*pro hac vice* forthcoming)
ALSTON & BIRD, LLP
1201 West Peachtree Street
Atlanta, GA  30309-3424
Telephone: (404) 881-7196
Facsimile: (404) 253-8473
Randall.Allen@alston.com

Michael D. Hausfeld (*pro hac vice* forthcoming)
Swathi Bojedla (*pro hac vice* forthcoming)
HAUSFELD, LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
mhausfeld@hausfeld.com
sbojedla@hausfeld.com

February 21, 2018
Columbia, South Carolina.

ATTORNEYS FOR THE PLAINTIFFS

34