# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| EUGENE BATEN, CHESTER WILLIS, CHARLETTE PLUMMER-WOOLEY, BAKARI SELLERS, CORY ALPERT, BENJAMIN HORNE, <br><br>  Plaintiffs, <br><br> vs. <br><br> HENRY MCMASTER, *i/o/c* as Gov. of South Carolina; MARK HAMMOND, *i/o/c* as Secretary of State of South Carolina; SOUTH CAROLINA ELECTION COMMISSION; BILLY WAY, JR., MARK BENSON, MARYLIN BOWER, E. ALLEN DAWSON, NICOLE SPAIN WHITE, *i/o/c* as a Commission Members of the Election Commission, <br><br>  Defendants. | No. 2:18-cv-00510 <br><br> **ORDER** |

This matter comes before the court on defendant Henry McMaster's ("the Governor") motion to dismiss, ECF No. 14. For the reasons set forth below, the court **GRANTS** the motion.

## I. BACKGROUND

Plaintiffs, all residents of voting age in South Carolina, bring this action alleging that South Carolina's system for distributing its nine votes for the electoral college for the election of the President of the United States is unconstitutional. Plaintiffs are all residents of various counties in South Carolina. They have all voted for the Democratic presidential candidate in past elections and intend to vote for the Democratic presidential candidate in future elections. Several of the plaintiffs are African-American.

1

Plaintiffs filed suit on February 21, 2018. Similar claims were filed on the exact same date by a relatively similar group of lawyers in the Central District of California, the District of Massachusetts, and the Western District of Texas. See Rodriguez v. Brown, 2:18-cv-01422 (C.D. Cal. Sept. 21, 2018); Lyman v. Baker, 1:18-cv-10327 (D. Mass. Feb. 21, 2018); League of United Latin American Citizens v. Abbott, 5:18-cv-0175 (W.D. Tex. Apr. 9, 2018). Those courts all dismissed those actions based on similar grounds as the court relies upon here. The Governor filed a motion to dismiss this action on May 3, 2015, ECF No. 14, which defendant Mark Hammond joined, ECF No. 17. Plaintiffs filed a response on May 31, 2018. ECF No. 24. The court held a hearing on the matter on November 1, 2018. ECF No. 31.

## II.   STANDARD

A Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted); see also Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."). To be legally sufficient, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A Rule 12(b)(6) motion should not be granted unless it appears certain that the plaintiff can prove no set of facts that would support his claim and would entitle him to relief. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). When considering a Rule 12(b)(6) motion, the court should accept all well-pleaded allegations as true and should view the complaint in a light most favorable to the plaintiff.

2

Ostrzenski v. Seigel, 177 F.3d 245, 251 (4th Cir.1999); Mylan Labs., Inc., 7 F.3d at 1134. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

### III. DISCUSSION

Article II, Section 1 of the United States Constitution provides that the President shall be elected in the following manner: "each state shall appoint, in such manner as the Legislature thereof may direct, a number of electors, equal to the whole number of Senators and Representatives to which the State may be entitled in the Congress . . . ." U.S. Const. art. II, § 1. "The Electors shall meet in their respective states and vote by ballot for President and Vice-President . . . ." Id. Am. XII. The Constitution delegates to the states the power to determine how these Electors are chosen. McPherson v. Blacker, 146 U.S. 1, 35 (1892) ("[I]t is seen that from the formation of the government until now the practical construction of the clause has conceded plenary power to the state legislatures in the matter of the appointment of electors.").

South Carolina, along with forty-seven other states and the District of Columbia, uses the winner-takes-all ("WTA") approach to determine how to allocate its nine electoral votes. According to South Carolina's WTA system, voters in South Carolina cast their ballot for either of "the candidates for President and Vice President of each political party recognized in" the state. S.C. Code § 7-19-70. South Carolina then

calculates which of the two candidates receives the most votes and delegates each of its nine electoral votes to that candidate. Plaintiffs argue that this dilutes the value of the votes cast for the losing representative, because those votes are not ultimately represented by the electoral votes in the presidential election. For example, South Carolina has not given its nine electoral votes to a Democratic presidential candidate for forty years. In other words, those South Carolina residents who have voted for Democratic candidates for the last forty years have had no electoral votes cast by South Carolina that reflect the vote that they cast for their choice of President.

Plaintiffs allege that the WTA system violates: (1) the Fourteenth Amendment, as it runs afoul of the one person one vote principle ("OPOV principle"); (2) the First and Fourteenth Amendments, as it burdens the freedom of the people to associate and engage in political activity; and (3) section 2 of the Voting Rights Act ("VRA"), as it prevents African-American South Carolinians from having their preferred candidate receive any representation among South Carolina's electoral votes. The court addresses each below in turn.

A. **One Person One Vote**

Plaintiffs allege that South Carolina's WTA system results in the votes of citizens who chose a losing candidate not being counted in the final election for president, and that it therefore violates the OPOV principle and the Fourteenth Amendment's guarantee of equal protection. Plaintiffs claim that the WTA system "counts votes for a losing presidential candidate in South Carolina only to discard them in determining the Electors who cast votes directly for the presidency." Comp. ¶ 14. In the last five presidential elections, about 40% of South Carolina voters cast votes for a candidate who did not win

the popular vote in South Carolina.  Id.  Plaintiffs claim that those voters "effectively had their votes cancelled."  Id.  Plaintiffs emphasize that they are not contesting the constitutionality of the electoral college as a whole, but rather the method used by South Carolina for choosing how to distribute its electoral votes.

      The Supreme Court first foreshadowed the OPOV principle in Baker v. Carr, 369, U.S. 185 (1962), the seminal case establishing the parameters of constitutional standing and other justiciability issues.[1]  The next year, the Court expounded upon the idea in Gray v. Sanders, 372 U.S. 368 (1963), when it declared unconstitutional Georgia's county unit system, which the state used to count votes in a Democratic primary for the nomination of a U.S. senator.  The Court determined that the system diluted the voting power of those in more populated districts and reasoned that a state's policy to dilute someone's vote based on where they live is similar to a policy that would dilute someone's vote based on their gender or race, in clear violation of Nineteenth and Fourteenth Amendments, respectfully.  Id. at 379.  Unlike the case currently before this court, Gray did not relate to a state's system for distributing its electoral votes, but was rather concerned with the constitutionality of Georgia's system for electing its representative to the U.S. Senate.  Indeed, the Court clearly distinguished Georgia's system from the electoral college in finding that "analogies to the electoral college . . . are inapposite."  Id. at 378.  The court explicitly noted that "inclusion of the electoral college in the Constitution, as the result of specific historical concerns, validated the collegiate principle despite its inherent numerical inequality . . . ."  Id.

---

[1] Defendants have not raised any justiciability concerns here.

A key case interpreting the same issue before this court came soon after <u>Gray</u>, when the state of Virginia was sued over its use of the WTA system for its electoral college votes in <u>Williams v. Va. State Bd. Of Elections</u>, 288 F. Supp. 622 (E.D. Va. 1969), summarily aff'd without opinion, 393 U.S. 320 (1969). The district court in <u>Williams</u> dismissed the complaint and upheld Virginia's WTA system in the face of a Fourteenth Amendment challenge, reasoning that

> it is difficult to equate the deprivations imposed by the unit rule with the denial of privileges outlawed by the one-person, one-vote doctrine or banned by Constitutional mandates of protection. <u>In the selection of electors the rule does not in any way denigrate the power of one citizen's ballot and heighten the influence of another's vote</u>. Admittedly, once the electoral slate is chosen, it speaks only for the element with the largest number of votes. This in a sense is discrimination against the minority voters, but in a democratic society the majority must rule, unless the discrimination is invidious. <u>No such evil has been made manifest here. Every citizen is offered equal suffrage and no deprivation of the franchise is suffered by anyone</u>.

<u>Id.</u> at 627 (emphasis added).

The Supreme Court affirmed without issuing an opinion. Defendants now rely on the Supreme Court's summary affirmation of the case's dismissal to argue that the current case should be dismissed as well. When the Supreme Court summarily affirms a decision without an opinion, it "affirm[s] the judgment but not necessarily the reasoning by which it was reached." <u>Mandel v. Bradely</u>, 432 U.S. 173, 175 (1977). "An unexplicated summary affirmance settles the issues for the parties, and is not to be read as a renunciation by this Court of doctrines previously announced in our opinions after full argument." <u>Id.</u> At the same time, summary affirmances do "reject the specific challenges presented" in the district court case and "prevent lower courts from coming to

6

opposite conclusions on the precise issues presented and necessarily decided by those actions." Id. at 176.

Plaintiffs argue that Virginia's electoral system was sufficiently distinct from South Carolina's system to allow this court to now rule differently than the Williams court on the constitutionality of South Carolina's WTA system. Specifically, the relevant Virginia statute that established the Commonwealth's WTA system provides that

> [t]here shall be chosen by the qualified voters of the Commonwealth, . . . so many electors for President and Vice President of the United States as this State shall be entitled to at the time of such election . . . . Each voter may <u>vote for one elector</u> from each congressional district of the state . . . and for two electors from the State at large.

Va. § 24-7 (emphasis added). Virginia's system provided for the election of individual electors; after the votes regarding all electors from each district were tallied, Virginia would see which party got the most votes and, in essence, transform the process into a WTA system and give all of the electoral votes to the winning candidate/party. By contrast, S.C. Code § 7-19-70 provides that the "names of candidates for electors . . . shall not be printed on the ballot." Rather, "in place of their names . . . there shall be printed on the ballot the names of the candidates for President and Vice President of each political party recognized in this State." The statute specifically states that a "vote for the candidates named on the ballot shall be a vote for the electors of the party by which those candidates were nominated." The court finds it irrelevant that the Virginia statue allowed its citizens to vote for a particular elector rather than the candidate, because the electors in Virginia were aligned with one of the two parties, and the Commonwealth ultimately gave 100% of its electoral college votes to the candidate of the party that had the most electors chosen.

7

Ultimately, the question of one person one vote depends upon whether an electoral system unfairly elevates one person's vote over another. The court agrees with the other district courts that have recently considered this issue and finds that the WTA system "complies with equal protection because it does not inherently favor or disfavor a particular group of voters." Lyman v. Baker, 1:18-cv-10327, ECF No. 52 at 15. As the District of Massachusetts aptly summarized, the "WTA system [ ] sets the stakes, but it does not help or hurt one group's chances of winning the [state's] electors." Id. at 21. While the outcome is not as proportional to the citizens' choices as plaintiffs might like, "[t]o the extent that the plaintiffs desire nevertheless to invalidate this system and establish a proportionate one, that is not something this court is empowered to do." Id. at 17.

Since Williams in 1968, the Supreme Court has further developed the OPOV principle. Williams seemed to indicate that the Supreme Court foreclosed any actions against the WTA system based on the Fourteenth Amendment. However, plaintiffs argue that, since Williams, Supreme Court jurisprudence on election law has developed to such an extent that there are new standards that should be relied upon to determine whether any election process—including the system for choosing Electors—violates the OPOV principle. The expansion of the OPOV principle in various election law cases reached its pinnacle in Bush v. Gore, 121 S.Ct. 525 (2000). In Bush v. Gore, the Court found that the manner in which Florida recounted some of its contested ballots for the presidential election was unconstitutional because the recounting process was arbitrary and resulted in disparate treatment of votes. The court found that "[w]hen the legislature vests the right to vote for president in its people, the right to vote as the legislature has prescribed is

8

fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and equal dignity owed to each voter." Bush, 531 U.S. at 529. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." Id. Here, the state of South Carolina has vested the right of each voter to cast a vote for a specific presidential candidate and as such, each person's vote is entitled to equal weight. The real question then becomes what it means for "equal weight" to be accorded to each vote.

There are, in reality, two stages of the presidential election process when using a WTA system. First, the citizens of each state cast their vote for a particular candidate, party, or elector who in essence represents a particular candidate. The second stage requires the state to determine which candidate the majority of its citizens voted for and then allocate however many electoral votes it has in favor of the candidate that received the majority of votes. The Court in Bush v. Gore indicated that according "equal weight" to each vote means that the literal ballot cast by a voter in stage one of the presidential election process be treated exactly the same as every other ballot cast in stage one. Notably, Bush v. Gore did not involve a claim against Florida's system for allocating electoral votes; rather, it involved the manner in which a Florida treated the votes of individual citizens before the state even chose how to allocate its electoral votes.

This differs from the issue currently presented before this court—whether the OPOV principle requires that equal weight be given to each vote during stage two of the election process. Plaintiffs make compelling arguments based on logic and public policy, and even create an enticing legal argument for extending the principles of Bush v. Gore and other election law cases to the context of WTA systems for the electoral college.

While the court recognizes that the plaintiffs' arguments have some merit, it will not extend the principles of Bush v. Gore to a factually distinct scenario, particularly given the unique nature of the electoral college system. The court leaves it to the Supreme Court to determine whether it wishes to extend Bush v. Gore's reasoning to find that South Carolina's WTA system of apportioning its electoral college votes violates the constitutional rights of South Carolinians to have their vote for president be accorded "equal weight" and "equal dignity."

### B. Right to Association

Next, plaintiffs allege that the WTA system "poses a severe burden on plaintiffs' rights to associate and to effectively express their political preference through voting that is not outweighed by any legitimate state interest," and as such violates the First and Fourteenth Amendments. Comp. ¶ 115. The court acknowledges that it is "beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson, 357 U.S. 449, 460 (1958). The court also recognizes that "political belief and association constitute the core of those activities protected by the First Amendment." Elrod v. Burns, 427 U.S. 347, 356 (1976).

Plaintiffs claim that the WTA system places burdens on the right of association and the right to have a voice in presidential elections through casting a vote. Regarding the right of association, the plaintiffs have not sufficiently alleged that the rights of voters to associate in any manner or to engage in any political activity or association have actually been burdened. Rather, plaintiffs merely allege that the inability of Democratic

voters in South Carolina to succeed in having any electoral votes distributed to a Democratic presidential candidate for the past forty years has dampened the likelihood that they will engage in political activity, as it appears useless. This argument conflates a diminishing <u>motivation</u> to participate with a severe burden on the actual <u>ability</u> of people to participate in the voting process.

Plaintiffs cite <u>Tashijan v. Republican Party of Conn.</u>, 479 U.S. 208 (1986), in which the Court found unconstitutional a state law that restricted access to primary voting to those who were registered members of the particular party, finding that this law limited "the Party's associational opportunities at the crucial juncture at which the appeal to the common principles may be translated into concerted action, and hence to political power in the community." <u>Tashijan</u>, 479 U.S. at 216. <u>Tashijan</u>, like so many other cases which have considered the constitutionality of election laws, involved internal state elections for state representatives for either state or national legislative bodies. That case differs significantly from the system for electing a President established by our Constitution. The parties have not provided any cases in which a court has questioned the WTA system under a freedom of association theory. Thus, the court denies the second cause of action.

**C. Voting Rights Act, Section 2**

Finally, plaintiffs argue that the WTA system results in the denial or abridgement of the voting rights of African-American South Carolinians on account of race or color, in violation of § 2 of the VRA, 52 U.S.C. § 10301. Section 2 provides that: "[No] standard, practice, or procedure shall be imposed or applied by any State [ ] in a manner which results in a denial or abridgement of the Right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). The VRA states that a

violation of this statue will be established if the election process is "not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). The Supreme Court set out the following three-part test for bringing a successful § 2 claim: (1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be able to show that it is politically cohesive"; and (3) "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc enable it . . . to defeat the minority's preferred candidate." Thornburg v. Gingles, 478 U.S. 30, 34 (U.S. 1986).

      Regardless of whether plaintiffs can meet these three provisions, the fact remains that this claim operates on the same premise as their OPOV claim—that courts should be able to consider the constitutionality of a state's WTA electoral college system using the same legal tools and concepts of constitutional fairness that the courts have relied on in assessing state-level voting procedures. Plaintiffs have argued that the vast majority of African-American voters in South Carolina identify as Democrats, and that because Democrats have not had any electoral votes cast for their preferred candidate in forty years, the African-American community in South Carolina has not had any votes cast for its preferred candidate in forty years. However, as discussed above, the WTA system does not mean that the political process is "not equally open to participation by" Democratic voters, whether they be African-American or of another race. 52 U.S.C. § 10301(b). Additionally, many white South Carolinians voted for Democratic candidates

in the past, demonstrating that the white majority has not voted "sufficiently as a bloc . . . to defeat the minority's preferred candidate." Thornburg, 478 U.S. at 34. For these reason, the court must dismiss plaintiffs' third cause of action.

## IV. CONCLUSION

For the reasons set forth above, the court **GRANTS** the motion to dismiss and dismisses this action in full.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 8, 2019**
**Charleston, South Carolina**