**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 19-1297**

———————

EUGENE BATEN; CHESTER WILLS; CHARLETTE PLUMMER-WOOLEY;
BAKARI SELLERS; CORY C. ALPERT; BENJAMIN HORNE,

Plaintiffs - Appellants,

v.

HENRY MCMASTER, in his official capacity as Governor of the State of South
Carolina; MARK HAMMOND, in his official capacity as Secretary of the State of
South Carolina; SOUTH CAROLINA ELECTION COMMISSION; BILLY WAY,
JR., in his official capacity as a Chair of the Election Commission; MARK
BENSON, in his official capacity as a Commission Member of the Election
Commission; MARILYN BOWER; E. ALLEN DAWSON, in his official capacity
as a Commissioner Member of the Election Commission; NICOLE SPAIN WHITE,
in her official capacity as a Commission Member of the Election Commission,

Defendants - Appellees.

--------------------------------------

EDWARD FOLEY,

Amicus Curiae.

———————

Appeal from the United States District Court for the District of South Carolina, at
Charleston.  David C. Norton, District Judge.  (2:18-cv-00510-DCN)

———————

Argued:  May 26, 2020                                    Decided:  July 21, 2020
                              Amended:  July 28, 2020

———————

Before NIEMEYER, WYNN, and FLOYD, Circuit Judges.

———————————

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Floyd joined. Judge Wynn wrote a dissenting opinion.

———————————

**ARGUED:** Jacob Max Rosen, MUNGER, TOLLES & OLSON, LLP, San Francisco, California, for Appellants. Thomas Ashley Limehouse, Jr., OFFICE OF THE GOVERNOR OF SOUTH CAROLINA, Columbia, South Carolina, for Appellees. **ON BRIEF:** David Boies, Armonk, New York, James P. Denvir, III, Amy J. Mauser, Karen L. Dunn, Lisa Barclay, Amy L. Neuhardt, Hamish P.M. Hume, Melissa Shube, BOIES, SCHILLER & FLEXNER LLP, Washington, D.C.; Randall L. Allen, B. Parker Miller, Max Marks, Cassandra K. Johnson, ALSTON & BIRD LLP, Atlanta, Georgia; Richard Harpootlian, Christopher P. Kenney, RICHARD A. HARPOOTLIAN, PA, Columbia, South Carolina, for Appellants. Vordman Carlisle Traywick, III, ROBINSON GRAY STEPP & LAFFITTE, LLC, Columbia, South Carolina, for Appellees. Jeffrey I. Pasek, Philadelphia, Pennsylvania, for Amicus Curiae.

———————————

NIEMEYER, Circuit Judge:

A group of South Carolina voters commenced this action to challenge the "winner-take-all" aspect of South Carolina's process for appointing its nine Electors to the Electoral College.

Under South Carolina's winner-take-all appointment process, every eligible voter in South Carolina is given the right to cast a vote for candidates for President and Vice President, and every such vote is given the same weight and dignity. The vote so cast is, under South Carolina law, an indirect vote for a slate of nine Electors committed to a presidential ticket, and the Electors then vote for those candidates in the Electoral College. Thus, the candidates receiving the most votes secure the State's appointment of Electors committed to vote for them in the Electoral College. The losing candidates have no Electors appointed to vote for them in the Electoral College, as the method for appointing Electors is a unity method in which the entire slate of Electors is awarded to the winning candidates.

In their complaint, the plaintiffs alleged that this winner-take-all process dilutes the voting power of the State's political minority and burdens their ability to advocate effectively for their preferred political candidates, in violation of the First and Fourteenth Amendments. They also alleged that the process prevents Black citizens from exercising electoral power in presidential elections commensurate with the size of their population, in violation of the Voting Rights Act ("VRA").

The district court granted South Carolina's motion to dismiss the complaint, concluding that South Carolina's winner-take-all process complies with the Constitution and the requirements of the VRA. We agree and affirm.

## I

The U.S. Constitution provides that the President and Vice President shall be elected by a College[*] of "Electors" appointed by the States "in such Manner as the Legislature[s] thereof may direct." U.S. Const. art. II, § 1, cl. 2. The number of Electors allocated to each State for appointment is equal to the "Number of Senators and Representatives to which the State may be entitled in the Congress." *Id*. Once appointed, the Electors are directed to "meet in their respective states" on a day determined by Congress and vote "in distinct ballots" for President and Vice President. *Id*. amend. XII. The votes are then transmitted to Washington, D.C., where the President of the Senate counts them. *See id*. "The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed," and the same is so for the Vice President. *Id*.

In exercising their authority to appoint Electors, the States have, over the years, adopted different methods. For example, in the first presidential election in 1788–89, the legislatures in five States appointed the State's Electors directly, and in other States, the Electors were elected by the people in districts created by the State. Pennsylvania provided

---

[*] The body of Electors is traditionally referred to as a "College," although the word does not appear in the Constitution. It does appear in the implementing statute. *See* 3 U.S.C. § 4.

for a statewide election of Electors — Electors "on a general ticket" pledged to a presidential candidate. *See McPherson v. Blacker*, 146 U.S. 1, 29–30 (1892). In the decades that followed, the States continued to exercise their appointment authority variously, as their legislatures determined. Some legislatures continued to appoint Electors directly; some authorized the voters to select a slate of Electors by a statewide election; some authorized voters to select individual Electors by districts; and some created hybrid systems. But eventually, as it became understood that a unified slate of Electors would give the States the greatest influence in the Electoral College, States made the political decision that the selection of a "general ticket" of Electors pledged to the winning candidate — the winner-take-all approach — was advantageous. As of 1836, all States except South Carolina appointed their Electors by statewide popular vote. *See id.* at 32. And following the Civil War, South Carolina followed suit. At the present time, every State but Maine and Nebraska awards all of its electoral votes to the presidential ticket that received a plurality of the votes statewide. And in Maine and Nebraska, two Electors are selected by statewide election and the remainder are selected by districts. *See Chiafalo v. Washington*, 140 S. Ct. 2316, 2321 n.1 (2020).

South Carolina's current statutory scheme implements a rather typical winner-take-all process. *See Chiafalo*, 140 S. Ct. at 2321–22 (describing in general terms the standard process used by States to select Electors and to ensure their votes for pledged candidates). Under its scheme, each political party recognized in South Carolina submits a list of Elector candidates to the Secretary of State prior to Election Day. *See* S.C. Code Ann. § 7-19-70. Those Elector candidates are required to "declare which candidate for president and vice-

president he will vote for if elected" and, if elected, are directed to vote in the Electoral College "for the president and vice-president candidates for whom they declared." *Id.* § 7-19-80. The names of the Elector candidates submitted by the parties to the Secretary of State, however, do not appear on the ballot. Instead, the voters are presented with "the names of the candidates for President and Vice President" nominated by each party, and a "vote for the candidates named on the ballot [constitutes] a vote for the electors of the party by which those candidates were nominated." *Id.* § 7-19-70. After the polls close, South Carolina's Secretary of State receives the vote tally and appoints the slate of Electors submitted by the party whose presidential and vice-presidential candidates received the most votes. *Id.* The appointed Electors are then required, on the day designated by Congress, to cast their votes for those candidates. *See id.* § 7-19-80. This winner-take-all process thus involves the statewide, indirect election of a slate of Electors pledged to the candidates on the ballot who receive a plurality of the votes. The Electors so appointed then vote for their candidates for President and Vice President at the Electoral College election held at the time specified by Congress — currently, the first Monday after the second Wednesday in the December following the election. *See* 3 U.S.C. § 7.

## II

The six plaintiffs, three of whom are African-American, are voting-age residents of various South Carolina counties who have voted for the Democratic presidential candidate in past elections and plan to do so again in the future. They commenced this action to challenge "the decision of South Carolina to award and select Electors on a [winner-take-

2:18-cv-00510-DCN    Date Filed 07/27/20    Entry Number 44    Page 7 of 65
USCA4 Appeal: 19-1297    Doc: 86    Filed: 07/27/2020    Pg: 7 of 65

all] basis," and they named as defendants South Carolina's Governor, Secretary of State, and Election Commission, including its members — all sued in their official capacity and collectively referred to herein as "South Carolina." The complaint explicitly stated that it was not filed to challenge the Electoral College, "which is mandated by the Constitution," but rather to challenge the South Carolina statutory scheme adopted to select electors to the College on a winner-take-all basis. The plaintiffs alleged that "the political party of the leading candidate among South Carolina's voters selects every Elector, with a vote of *every other* South Carolina citizen rendered meaningless by receiving no Elector directly or through a political party." (Emphasis added). They explained that in the 2016 election, Donald Trump received roughly 55% of the popular vote in South Carolina but yet received all nine of the State's electoral votes, whereas Hillary Clinton received roughly 41% of the popular vote "but received none of the electoral votes from South Carolina." The complaint also asserted that under the scheme, African-American voters, who "represent over a quarter of the voting age population of the [S]tate," are effectively disenfranchised. "In each of the last ten presidential elections the candidate who won South Carolina and received all of South Carolina's Electors has been a Republican and has not been the preferred candidate for African-American voters."

Thus, as framed in the complaint, with use of the winner-take-all process, the votes of those who did not vote for the winning candidate were "cancelled when the final direct election for President [took] place," including "as many as 855,373 South Carolina citizens who voted for Hillary Clinton in 2016." For that reason, the plaintiffs claimed that the

process violates the Fourteenth Amendment, the First Amendment, and § 2 of the VRA.

With respect to the alleged Fourteenth Amendment violation, the complaint asserted:

> [The winner-take-all] scheme violates the Fourteenth Amendment because it counts votes for a losing presidential candidate in South Carolina only to discard them in determining Electors who cast votes directly for the presidency. Put differently, the [winner-take-all] system unconstitutionally magnifies the votes of a bare plurality of voters by translating those votes into an entire slate of presidential Electors, all of whom support the nominee of a single political party — while, at the same time, the votes cast for all other candidates are given no effect.

This, according to the plaintiffs, violates the principle of "one person, one vote." With respect to the alleged First Amendment violation, the complaint asserted that the system "burdens . . . the right of association and . . . the right to have a voice in presidential elections through casting a vote." And finally, with respect to the alleged VRA violation, the complaint asserted that, "[d]espite the fact that South Carolina has nine Electors, and African Americans represent over a quarter of the voting age population of the state, the [winner-take-all] system allows white voters to usually — if not always — defeat all Electors slated for African-American preferred candidates."

For relief, the complaint sought a declaratory judgment that South Carolina's winner-take-all process violates the referenced provisions and an injunction prohibiting the use of the process in the future.

The district court granted South Carolina's motion to dismiss the complaint, concluding that South Carolina's winner-take-all system "complies with equal protection because it does not inherently favor or disfavor a particular group of voters." *Baten v. McMaster*, 374 F. Supp. 3d 563, 569 (D.S.C. 2019) (quoting *Lyman v. Baker*, 352 F. Supp.

3d 81, 89 (D. Mass. 2018)).  The court likewise rejected the plaintiffs' First Amendment claim, as the plaintiffs had not "sufficiently alleged that the rights of voters to associate in any manner or to engage in any political activity or association ha[d] actually been burdened." *Id.* at 570.  And finally, the court dismissed the plaintiffs' VRA claim, noting that the winner-take-all system "does not mean that the political process is not equally open to *participation* by Democratic voters, whether they be African-American or of another race." *Id.* at 571 (cleaned up).

From the district court's judgment dated March 11, 2019, the plaintiffs filed this appeal.  South Carolina filed a motion to dismiss the appeal for lack of subject matter jurisdiction, arguing (1) that this case implicates non-justiciable political questions and (2) that the plaintiffs lack Article III standing.  We deferred ruling on that motion pending briefing on the merits and oral argument.

## III

At the threshold, we address South Carolina's motion to dismiss this appeal for lack of subject matter jurisdiction.  It contends that the plaintiffs' claims present non-justiciable political questions, as "the state legislatures' power to choose the manner of appointing presidential electors is plenary," and "partisan proportionality claims" are non-justiciable under the Supreme Court's recent decision in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019).  It also contends that the plaintiffs' claims are simply "generalized partisan grievances" and, therefore, that the plaintiffs lack Article III standing.

On the issue of justiciability, it is true that Article II of the Constitution gives state legislatures the power to appoint Electors in the manner they see fit.  But it is also well settled that Article II does not vest the States with unreviewable authority.  *See, e.g.*, *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam) (recognizing that although "the state legislature's power to select the manner for appointing electors is plenary," "[w]hen the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental"); *see also Chiafalo*, 140 S. Ct. at 2324 & n.4 (explaining that "Article II, § 1's appointments power gives the States far-reaching authority over presidential electors, *absent some other constitutional constraint*," such as the Equal Protection Clause (emphasis added)).  Moreover, the Supreme Court has confirmed that whether a state legislature has exercised its delegated power to appoint Electors in a way that violates another provision of the Constitution presents a justiciable question.  *See, e.g.*, *McPherson*, 146 U.S. at 23–24 ("It is argued that the subject-matter of the controversy is not of judicial cognizance, because it is said that all questions connected with the election of a presidential elector are political in their nature. . . .  But the judicial power of the United States extends to all cases in law or equity arising under the constitution and laws of the United States, and this is a case so arising, since the validity of the state law was drawn in question as repugnant to such constitution and laws . . . .");  *Williams v. Rhodes*, 393 U.S. 23, 28 (1968) (rejecting Ohio's argument that "the political-question doctrine precludes judicial consideration" of challenges to its laws regulating access to the state ballot to choose electors, concluding unequivocally that these types of cases "do raise a justiciable controversy under the Constitution and cannot be relegated to

10

the political arena"). We do not believe that the Court's subsequent decision in *Rucho* undermined these principles, as South Carolina argues.

In *Rucho*, the Supreme Court held that *partisan gerrymandering* claims present nonjusticiable political questions. But it recognized that partisan gerrymandering claims were distinct from other similar claims, noting that "[p]artisan gerrymandering claims have proved far more difficult to adjudicate" than other challenges to the electoral system, such as those alleging racial gerrymandering or violations of the one-person, one-vote principle. *Rucho*, 139 S. Ct. at 2497. We thus agree with those courts that have considered the question before us and determined that challenges to winner-take-all systems for appointing presidential Electors are indeed justiciable. *See Lyman v. Baker*, 954 F.3d 351, 378 n.16 (1st Cir. 2020); *Williams v. Va. State Bd. of Elections*, 288 F. Supp. 622, 625 (E.D. Va. 1968) (holding that the court "ha[d] jurisdiction of the complaint," which challenged Virginia's use of the winner-take-all system to appoint presidential Electors), *aff'd per curiam*, 393 U.S. 320 (mem.), *reh'g denied*, 393 U.S. 1112 (1969).

With respect to Article III standing, we conclude that the plaintiffs adequately alleged that they "had the requisite stake in the outcome [of the case] when the suit was filed." *Davis v. FEC*, 554 U.S. 724, 734 (2008). They were required to allege (1) that they suffered a concrete and particularized "injury in fact" that was more than merely hypothetical or conjectural; (2) that the injury is "fairly traceable to the challenged action of the defendant"; and (3) that it is likely "that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

11

In their complaint, the plaintiffs have fairly satisfied these elements. *First*, they alleged that they are voters whose votes for Democratic presidential candidates were, in effect, discarded under South Carolina's winner-take-all process. They argued that, because all of South Carolina's electors were pledged to vote for the plurality winner, their preferred candidates received zero votes in the Electoral College. Thus, the system "disadvantage[d] [them] as individuals." *Gill v. Whitford*, 138 S. Ct. 1916, 1920–21 (2018) (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)) (contrasting the individual harm felt by a voter who casts his ballot in a gerrymandered district with the "generalized grievance" of one who disapproves of gerrymandering in his state but does not live in a gerrymandered district). This is the type of concrete, particularized injury that Article III contemplates. *See Gray v. Sanders*, 372 U.S. 368, 375 (1963) ("[A]ny person whose right to vote is impaired has standing to sue" (citations omitted)). *Second*, the plaintiffs alleged that the injury is caused by the winner-take-all system, which, even though enacted by the State's legislature, was implemented and enforced by the state officials who are named as defendants. And *third*, they claimed that it is within the judicial power to enjoin the use of an unlawful system, even though a court could not order South Carolina specifically to adopt the proportional system of appointing Electors, as the plaintiffs might prefer. In short, the plaintiffs alleged that they suffered individualized injuries that are traceable to South Carolina's implementation of the challenged winner-take-all system and that the injuries can be redressed by a court order enjoining use of the system.

We conclude therefore that we have subject matter jurisdiction to address the merits of the plaintiffs' claims on appeal.

2:18-cv-00510-DCN    Date Filed 07/27/20    Entry Number 44    Page 13 of 65

IV

For their main argument on appeal, the plaintiffs contend that South Carolina's winner-take-all method of selecting presidential Electors violates the Equal Protection Clause. They explain that at the first stage of the two-step presidential election process, use of winner-take-all "dilutes votes" by not giving a voice to the political minority in selecting Electors and, at the second stage, the process "discards" the minority votes because only the Electors chosen by the plurality cast votes in the Electoral College. As they summarize,

> By awarding *all* of a State's Electors to whoever wins a plurality of the vote at the first stage, South Carolina's [winner-take-all] rules dilute and discard minority votes in *two ways*. It dilutes votes for the Electors themselves, using an at-large election for nine Electors to ensure minority voters never have any representation in that delegation. And it discards their votes for president at the second stage, ensuring that only Electors selected by the plurality can ever affect the presidential vote.

To support their argument that the first stage as implemented in South Carolina is unconstitutional, the plaintiffs rely on the Supreme Court's decision in *White v. Regester*, 412 U.S. 755 (1973), which, they argue, holds that "states may not use at-large, slate elections for multi-member bodies to ensure minority voters receive no representatives in those bodies." And to support their argument that the second stage as implemented in South Carolina also violates the Constitution, they rely on *Gray v. Sanders*, which, they argue, supports their position, noting that South Carolina's use of winner-take-all to award all of its Electoral votes to the plurality winner, impermissibly "ensures that the plaintiffs'

'votes for a different candidate are worth nothing and counted only for the purpose of being discarded.'" (cleaned up) (quoting *Gray*, 372 U.S. 381 n.12).

The untoward result, according to the plaintiffs, is that the system improperly magnifies the influence of the political plurality, thereby undermining the principle of one-person, one-vote, in violation of the Equal Protection Clause, which safeguards the "equal weight accorded to each vote and the equal dignity owed to each voter." *Bush*, 531 U.S. at 104.

In response, South Carolina contends that the plaintiffs' argument "ignores longstanding electoral practice and is foreclosed by binding Supreme Court precedent" in *Williams v. Virginia State Board of Elections*, 393 U.S. 320 (1969), which summarily affirmed a district court's rejection of a constitutional challenge to Virginia's use of the winner-take-all approach to select presidential Electors. It also argues that even if the case is not controlled by *Williams*, the winner-take-all system "comports with the Equal Protection Clause because it gives all who participate an equal vote and does not inherently favor or disfavor any particular group of voters."

The Electoral College system established in Article II and the Twelfth Amendment of the Constitution for the election of the President and Vice President manifests a complex and carefully balanced division of power and interests between the national government and state governments; between the large States and the smaller States; and between representational democracy and direct democracy. And it resulted from a lengthy debate of various proposals at the Constitutional Convention. *See, e.g.*, *Chiafalo*, 140 S. Ct. at 2320 (quoting a delegate to the Convention who remarked that the issue of determining the

14

method for presidential selection was "the most difficult of all [that] we have had to decide"). Among the various methods considered by the delegates at that Convention were a nationwide popular vote and an election by Congress. Ultimately, however, they settled on a hybrid method involving nation-based and state-based aspects. Article II thus provides that the President and Vice President are to be elected by Electors appointed by the States; that the number of Electors to be appointed from each State is to equal the number of Senators and House members representing the State in the Congress; and that the States' legislatures are to determine the manner of appointing the Electors.

The subtlety of this structure was eloquently described by James Madison in The Federalist. He explained that the House of Representatives derives its power directly *from the people*; that the Senate derives its powers *from the States as "political and coequal societies"* and therefore indirectly from the people; and the presidency derives its power *from a "compound source,"* through the Electoral College. *See The Federalist No. 39*, at 197 (George W. Carey & James McClellan eds. 1990) (emphases added). Madison continued, "[the Electoral College] appears [in the Constitution] to be of a mixed character presenting at least as many *federal* as national features." *Id*. Thus, in creating an Electoral College comprising Electors equal to the number of Senators and Representatives of each State, the Constitution takes into account the States as political and coequal societies by giving each two Electors simply by virtue of their statehood, and, at the same time, accounts for population of each State by giving each a number of Electors directly related to the State's House members. And while the Constitution creates this body of Electors to serve the national function of electing a President and Vice President, it directs that the States

15

appoint the Electors in the manner determined by their legislatures.  At bottom, the system reflects a considered balance between national and state power.

The plaintiffs' arguments are narrowly focused on two distinct aspects of this structure.  They argue first that South Carolina, in selecting Electors, unconstitutionally conducts a statewide winner-take-all election by selecting a "general ticket" of Electors, all of whom are pledged to their party's candidates.  In this manner, they argue, South Carolina fails to give effect to the votes of its citizens who did not cast votes with the plurality.  Second, they argue, when the Electors so selected uniformly vote for the candidate of their party, the system in effect "discards" the votes cast by the minority.

As to the plaintiffs' first argument, it cannot be disputed that each State has plenary authority to determine through its legislature how to appoint Electors.  And the power includes the authority to require Electors to vote for the presidential ticket that received the plurality of votes in the State.  As the Supreme Court noted recently,

> Article II, § 1's appointments power gives the States far-reaching authority over presidential electors. . . .  [A] State can insist (as *Ray* [*v. Blair*, 343 U.S. 214 (1952)] allowed) that the elector pledge to cast his Electoral College ballot for his party's presidential nominee, *thus tracking the State's popular vote*.

*Chiafalo*, 140 S. Ct. at 2324 (emphasis added).  Thus, nearly every State, including South Carolina, has validly exercised its authority in adopting a system for appointment of Electors that involves a statewide election for a slate of electors pledged to vote for the presidential ticket that wins the plurality vote — the very system that the plaintiffs contend is constitutionally barred because it fails to give effect to votes cast for other candidates. It is plaintiffs' position, nonetheless, that a State *may not adopt*, as a political calculation,

a plan that maximizes the State's influence at the Electoral College election, as the winner-take-all plan does. And if the plaintiffs are correct, the only permissible methods of appointment would necessarily incorporate proportional or district-level allocation, methods that are not prescribed by the Constitution. The plaintiffs argue that only in this way may the State "give effect" to votes cast for the losing candidates.

The plaintiffs' argument, however, runs headlong into the fundamental democratic principle that the one who receives the most votes wins, and the others lose, thus leaving them with no voice. While this argument is obviously untenable, it does not, of course, follow that an electoral mechanism can trample the fundamental electoral requirements that everyone entitled to vote be given the vote and that each vote be given equal weight. *See Bush*, 531 U.S. at 104–05. But the plaintiffs have not made the case that those fundamental requirements are not met by South Carolina's chosen system. Despite the plaintiffs' argument to the contrary, no vote in the South Carolina system is diluted. Every qualified person gets one vote and each vote is counted equally in determining the final tally. In the end, the presidential ticket that receives the most votes wins. That the system results in both winners and losers is inherent in our electoral process and does not give rise to a constitutional violation. This was precisely the position articulated by the three-judge district court in *Williams* while rejecting a challenge to the winner-take-all system, which we find persuasive:

> [I]t is difficult to equate the deprivations imposed by the unit [winner-take-all] rule with the denial of privileges outlawed by the one-person, one-vote doctrine or banned by Constitutional mandates of protection. In the selection of electors the rule does not in any way denigrate the power of one citizen's ballot and heighten the influence of another's vote. Admittedly, once the

17

> electoral slate is chosen, it speaks only for the element with the largest number of votes. This in a sense is discrimination against the minority voters, but in a democratic society the majority must rule, unless the discrimination is invidious. No such evil has been made manifest here. Every citizen is offered equal suffrage and no deprivation of the franchise is suffered by anyone.

*Id*. Recognizing that the winner-take-all method was merely an example of the "unit rule," the *Williams* district court stated that "nothing in the unit rule [is] offensive to the Constitution." *Id*. And the Supreme Court summarily affirmed the district court's ruling on appeal. *Williams*, 393 U.S. 320, *reh'g denied*, 393 U.S. 1112 (1969). To be sure, the Supreme Court's summary affirmance of the district court's decision in *Williams* "affirm[s] the judgment but not necessarily the reasoning by which it was reached," *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam) (quoting *Fusari v. Steinberg*, 419 U.S. 379, 391–92 (1975) (Burger, C.J., concurring )), but it does "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions," *id*.

The plaintiffs contend nonetheless that the Supreme Court's subsequent decision in *White v. Regester* precludes use of an at-large, statewide election that dilutes minority votes. In *White*, the Court held that the reapportionment plan for the Texas House of Representatives, which included both single-member districts and multi-member districts, was, as a whole, not invidiously discriminatory. 412 U.S. at 764. But it did affirm the district court's finding that in two multi-member districts, racial minority groups were effectively excluded from the political process to the extent that they were unable to elect representatives. *Id*. at 765. It also affirmed the district court's judgment to redraw those

multi-member districts as single-member districts. *Id.* The Court's justification for affirming these aspects was based on the extensive factual findings made by the district court of invidious discrimination against the minorities in those multi-member districts. Thus, the Supreme Court's holding is limited to where "multimember districts are being used invidiously to cancel out or minimize the voting strength of racial groups," *id*., requiring a showing that members of minority groups have, as a result of a districting plan, "*less opportunity* than [do] other residents in the district *to participate in the political processes* and to elect legislators of their choice," *id*. at 766 (emphasis added).

Thus understood, *White*'s holding does nothing to undermine the reasoning of the district court in *Williams*, as *White* addresses the dilutive effects of creating *multi-member legislative districts* and not of appointing Electors as a slate. Moreover, the plaintiffs in this case have not purported to claim invidious discrimination on the part of South Carolina. Indeed, they seem to agree that all persons entitled to vote have had the opportunity to vote and that their votes have been counted with equal weight, regardless of political affiliation. The essential problem that they identify is one that we cannot remedy — the fact that they did not have enough votes to achieve the outcome they desired. As the Supreme Court has observed, "we have not yet deemed it a denial of equal protection to deny legislative seats to losing candidates, even in those so-called 'safe' districts where the same party wins year after year." *Whitcomb v. Chavis*, 403 U.S. 124, 153 (1971).

The plaintiffs also argue that their votes are impermissibly "discarded" prior to the second stage of the electoral process, when the Electors cast the votes for the presidential candidates chosen by the plurality, as no Electors vote in accordance with the political

minority. According to the plaintiffs, the Supreme Court's decision in *Gray v. Sanders* precludes such "discarding" of votes after the first stage of a two-stage election. In *Gray*, a Georgia voter challenged the method by which Georgia's Democratic party tabulated votes to determine the primary winner in statewide elections. *See* 372 U.S. at 370. The Georgia system allocated to each county a certain number of "units," all of which were awarded to the popular vote winner of that county. Because of the way county units were allocated, small rural counties had disproportionate influence compared to larger or urban counties; "counties having population of one-third of the total in the state [had] a clear majority of county units." *Id.* at 373. Following an election, both the popular vote and the county unit vote were tabulated, and the candidate receiving a majority *of both* secured the nomination without a runoff. *See id.* at 372. If the tabulation of the popular vote and the county unit vote were split, the candidate with the greatest number of county unit votes in a runoff election would prevail. *See id.* The Court held that Georgia's system involved impermissible differential weighing of votes based on voter location. *Id.* at 379–81. It also suggested, in a footnote, that using a winner-take-all approach to allocate county units was impermissible even if the units were allocated proportionately by population:

> The county unit system . . . would allow the candidate winning the popular vote in the county to have the entire unit vote of that county. Hence the weighting of votes would continue, even if unit votes were allocated strictly in proportion to population. Thus if a candidate won 6,000 of 10,000 votes in a particular county, he would get the entire unit vote, the 4,000 other votes for a different candidate being worth nothing and being counted only for the purpose of being discarded.

*Id.* at 381 n.12.

The plaintiffs argue that the *Gray* Court's language in footnote 12 reveals the constitutional flaw in South Carolina's winner-take-all system. The Georgia circumstances, however, are materially distinguishable from those before us. First, in *Gray*, using winner-take-all at the county level had the potential to change the outcome of a statewide election by discarding minority votes in each county, possibly leading to the nomination at the second stage of a political representative that failed to secure even plurality support in the State in lieu of one who had such support. But in the presidential context, there is no statewide elected seat up for grabs — the second stage of the election occurs at the national level, and the two-step system is dictated by the Constitution. While using winner-take-all at the State level leaves open the possibility that a President could, on a nationwide basis, be elected despite losing the national popular vote, this very possibility is baked into the Constitution. Indeed, the *Gray* Court was careful to recognize this distinction:

> We think the analogies to the electoral college, to districting and redistricting, and to other phases of the problems of representation in state or federal legislatures or conventions are inapposite. The inclusion of the electoral college in the Constitution, as the result of specific historical concerns, validated the collegiate principle despite its inherent numerical inequality, but implied nothing about the use of an analogous system by a State in a statewide election. No such specific accommodation of the latter was ever undertaken, and therefore no validation of its numerical inequality ensued.

372 U.S. at 378 (footnotes omitted). Thus, the *Gray* Court recognized that the type of "numerical inequality" that may render a state electoral process unconstitutional is a feature — not a flaw — of the Electoral College system.

Moreover, the central concern in *Gray* — the differential treatment of votes depending on the county in which they were cast — is not at issue here. All votes cast in presidential elections in South Carolina are treated the same, and the candidate with the most support across the State gets the State's allocation of electoral votes in the Electoral College. Thus, there is no risk, as there was in *Gray*, that votes are treated differently based on geography.

The plaintiffs' criticism of the unitary system — where a slate of Electors from a State votes for a single ticket — is moreover dubious in light of the fact that the Constitution itself explicitly embraces such an approach, albeit at a different stage of the electoral process. In addressing how a tie vote in the Electoral College is to be resolved, the Constitution provides that the election of the President is then committed to the House of Representatives, and in carrying out the election, "the votes [in the House] shall be taken by states, *the representation from each state having one vote*." U.S. Const. amend. XII (emphasis added). Of course, the constitutionally prescribed method of tie-breaking "dilutes" or "discards" the vote of the minority House members from each State, in effect silencing the minority to allow each State to speak with one voice — the very process that the plaintiffs decry on the state level.

At bottom, South Carolina's winner-take-all system "does not treat any particular group of [voters in the State] differently at all — it does not inherently favor or disfavor voters from any particular group (political or otherwise)." *Lyman*, 954 F.3d at 371 (affirming dismissal of the complaint in a parallel case brought by Republican voters in Massachusetts). To be sure, when the plurality wins, it has the effect of rejecting the

outcome sought by voters supporting minority parties.  But that is the reality of any democratic system.  Absent some invidious discrimination that infects the process, it is difficult to comprehend a challenge to the various roles exercised in the selection of a President that does not also challenge the Constitution itself.  We affirm the district court's conclusion that plaintiffs did not state a claim for relief under the Equal Protection Clause.

V

The plaintiffs next contend that the winner-take-all method employed by South Carolina burdens their right to freedom of association, as protected by the First Amendment and applicable to the States through the Fourteenth Amendment.  In their view, the winner-take-all system "burdens Plaintiffs' ability to associate with like-minded voters — all of whom know that any such association, fundraising, or activities would be functionally useless."  (Citing *Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring)).

South Carolina maintains, as the district court concluded, that this argument "conflates a diminishing *motivation* to participate with a severe burden on the actual *ability* of people to participate in the voting process."  (Quoting *Baten*, 374 F. Supp. 3d at 570).  According to South Carolina, the plaintiffs have not alleged any actual burden, and merely "losing an election does not give rise to an unconstitutional infringement upon the associational rights of the losing candidate's supporters."

The Supreme Court has indeed recognized that "[t]he freedom of association protected by the First and Fourteenth Amendments includes partisan political organization. . . .  The right to associate with the political party of one's choice is an integral

23

part of this basic constitutional freedom." *Tashjian v. Republican Party of Ct.*, 479 U.S. 208, 214 (1986) (cleaned up).  Thus, States are prohibited from unduly interfering with a political party's ability to encourage participation, *see id.* at 217, or from placing unnecessary and unequal burdens on a political party seeking a place on the ballot, *see Rhodes*, 393 U.S. at 30–31.

The plaintiffs' claim of interference, however, is far more tenuous than those recognized as First Amendment violations.  They do not claim that South Carolina prevented their preferred candidates from appearing on the ballot or interfered with their ability to convince potential voters of their candidates' advantages.  Rather, the plaintiffs contend that their inability to secure the selection of any Democratic-affiliated Electors in presidential elections dampens enthusiasm for Democratic politics in South Carolina and thereby burdens their right to associate freely with the political party of their choice.  But this effect stems not from any action by South Carolina to inhibit Democratic participation in presidential elections, but rather from the Democrats' inability to muster a majority of South Carolina's votes.  And though the First Amendment protects the right to associate for the purposes of advocacy, it "provides no guarantee that a speech will persuade or that advocacy will be effective."  *Smith v. Ark. State Highway Emp., Local 1315*, 441 U.S. 463, 465 (1979) (citation omitted).  In other words, "[t]hat one's candidate of choice does not prevail at the ballot box simply does not translate into an associational rights violation." *Lyman*, 954 F.3d. at 377.  The winner-take-all system may "raise[] the stakes of victory," but it does not interfere with the plaintiffs' opportunity to associate for the purposes of advocating for such victory.  *Id.*

24

Similarly, the plaintiffs' suggestion that the winner-take-all system serves as a disincentive for political candidates to campaign in South Carolina, thereby impeding their ability to participate effectively in the political process, is too tenuous to support their freedom of association claim. The First Amendment guarantees the right to associate with the political party of one's choice to participate in the political process; it does not guarantee to the residents of South Carolina attention from candidates for nationwide office. Moreover, many considerations other than the likelihood that the candidate will receive needed Electoral College votes from a given State influence a presidential candidate's campaign event route, and therefore it is simply impossible to predict whether presidential candidates would be more likely to campaign in South Carolina if the winner-take-all system were abandoned. Indeed, if, as the plaintiffs maintain, a reliable portion of the eligible voting population in the State consistently votes for Democratic candidates and would continue to do so if South Carolina adopted a proportional system, such candidates might nonetheless make the strategic assessment that those votes were "safe" even without campaign stops in the State. At bottom, this argument does not support a cognizable First Amendment claim.

We thus affirm the district court's order also dismissing the plaintiffs' freedom of association claim.

VI

Finally, the plaintiffs contend that the district court erred in dismissing their claim under § 2 of the VRA, which prohibits standards, practices, or procedures imposed "in a

manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A violation of § 2 is established if, "based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally *open to participation* by members of a class of citizens protected by subsection (a) in that its members have *less opportunity than other members of the electorate to participate* in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b) (emphasis added). The Act specifies that it does not "establish[] a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.*

The plaintiffs maintain that "the vote dilution caused by South Carolina's [winner-take-all] rules is a mathematical certainty," arguing that the process prevents Black voters from choosing their preferred electors. Given the demographic breakdown of South Carolina's electorate and the partisan preferences of Black voters, the plaintiffs maintain that "South Carolina's [B]lack voters would be able to appoint two electors with no help from [W]hite voters if they had 'the opportunity to exercise an electoral power that is commensurate with [their] population in the relevant jurisdiction.'" (Quoting *Hall v. Virginia*, 385 F.3d 421, 429 (4th Cir. 2004)).

South Carolina contends simply that "the ultimate right of § 2 [of the VRA] is equality of *opportunity, not a guarantee of electoral success* for minority preferred candidates of whatever race," (emphasis added) (quoting *Johnson v. DeGrandy*, 512 U.S. 997, 1014 n.11 (1994)), and that Black voters in South Carolina have been unsuccessful in

26

having their preferred electors appointed simply because they vote for the less popular political party, not because minorities are excluded from the political process.

As the district court correctly stated, plaintiffs seeking to bring a claim under § 2 of the VRA to challenge the dilutive effects of a multi-member district must be able to show that (1) "the minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) "the minority group . . . is politically cohesive;" and (3) "the [W]hite majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986). But these requirements do not map onto the type of challenge that the plaintiffs have mounted here. *Gingles* involved a challenge to the use of multimember districts in North Carolina's legislative apportionment, which the plaintiffs argued diluted minority voting blocs that would form "effective voting majorities in single-member districts." *Id.* at 38. Whereas, here, by contrast, there is no alternative of a "single-member district" because the selection of electors in South Carolina does not involve districts at all. While the plaintiffs indeed allege that Black voters in South Carolina are a minority group "sufficiently large and geographically compact to constitute a majority in a single-member district," they fail to address what this means in the context of a *statewide* election. The relevant geographic area for the selection of presidential Electors is the entire State, and Black voters do not constitute a majority statewide. Moreover, even though the plaintiffs assert that the White majority votes sufficiently as a bloc to enable it to defeat the minority-preferred candidate, they elide the distinction between the *candidates* the minorities prefer — *i.e.* the Democratic presidential and vice-presidential candidates — and the "candidates"

that, in their view, they have sufficient political power to elect — *i.e.*, two out of nine of the presidential Electors.  Section 2 refers to the election of "representatives," not the appointment of Electors.  And while it is true that White voters may have, in recent decades, preferred Republican candidates and voted accordingly, Black voters are not sufficiently numerous to change the outcome.  This does not mean, however, that Black voters, who tend to prefer Democratic candidates, "have *less opportunity* than other members of the electorate *to participate* in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b) (emphasis added), as required to establish a violation of the VRA.

We therefore affirm the district court's order dismissing the plaintiffs' VRA claim.

\* \* \*

In sum, we deny South Carolina's motion to dismiss the appeal, and we affirm the judgment of the district court.

AFFIRMED

WYNN, Circuit Judge, dissenting[1]:

This matter arises from one simple yet remarkable fact: In every presidential election since 1980, the votes by South Carolinians for Democratic presidential candidates have been counted only for the purpose of being discarded because, despite representing a significant share of the state's total votes, South Carolinians' votes for Democratic candidates have translated into *no* votes in the Electoral College. Incredibly, South Carolina's state-wide, winner-take-all method of selecting presidential electors has rendered more than 4 million votes for Democratic candidates over the last five presidential elections worthless.

So, six Democratic voters from South Carolina brought this case alleging that this system unconstitutionally dilutes and discards their votes. The majority opinion affirms the district court in dismissing the case, putting Plaintiffs' claims to bed at an early stage.

But Plaintiffs deserve more than this short shrift dismissal of their claims. Viewing Plaintiffs' allegations with an open mind and accepting them as true, as we are required to do, Plaintiffs have stated plausible violations of the First and Fourteenth Amendments and the Voting Rights Act. In essence, they deserve, at least, an opportunity to be heard. With great respect for the differing view of my colleagues, I must dissent.

Having said that, the majority opinion must not be read as deterring future plaintiffs from questioning longstanding election practices that run counter to this country's

---

[1] I concur in the majority's denial of South Carolina's motion to dismiss the appeal for lack of subject matter jurisdiction.

foundational principles of democracy. At best, the majority opinion reflects a limited view of the judiciary's role in addressing fairness in elections. Yet, the Electoral College itself is an undemocratic process. And states like South Carolina exacerbate its undemocratic aspects by allocating all of their presidential electors to the state-wide popular vote winner.

This is not a question of partisanship—South Carolina discards votes for Democratic presidential candidates, but other states discard votes for Republican presidential candidates.[2] This is a question of the openness and fairness of the winner-take-all method of selecting presidential electors for the Electoral College.

## I.

On appeal, South Carolina argues that the Supreme Court's summary affirmance in *Williams v. Virginia State Board of Elections*, 288 F. Supp. 622 (E.D. Va. 1968), *aff'd*, 393 U.S. 320 (1969), forecloses Plaintiffs' claims. That argument largely carried the day in the district court and in the other courts that have recently considered parallel litigation.[3] The

---

[2] For example, in Massachusetts, more than one million votes were cast for the Republican presidential candidate in 2016. Despite constituting almost 33% of the total votes cast in the state, the Republican candidate received none of Massachusetts's eleven electoral votes. *Lyman v. Baker*, 954 F.3d 351, 356 (1st Cir. 2020). A similar result occurred in Massachusetts in the seven previous presidential elections. And the same pattern holds in other states like California and New York.

[3] At the time Plaintiffs brought this suit, their counsel filed parallel litigation on behalf of voters in Texas, Massachusetts, and California. *See Lyman v. Baker*, 954 F.3d 351 (1st Cir. 2020); *League of United Latin Am. Citizens v. Abbott*, 951 F.3d 311 (5th Cir. 2020); *Rodriguez v. Brown*, No. 2:18-cv-001422, 2018 WL 6136140 (C.D. Cal. Sept. 21, 2018), *appeal filed*, No. 18-56281 (9th Cir. 2018). The First and Fifth Circuits have affirmed the dismissal of the Massachusetts and Texas suits, respectively, although neither court considered a Voting Rights Act claim. The California case is still pending before the Ninth Circuit.

majority here describes *Williams* as "persuasive" but, apparently, does not give it the controlling weight afforded by other courts. Majority Op. at 17. Nonetheless, before addressing the approach taken by the majority in this matter, it is appropriate to address South Carolina's arguments and the district court's conclusion regarding *Williams*.

The district court's conclusion rested on the simple fact that *Williams*, like this case, involved a challenge to a state's winner-take-all method of selecting presidential electors. But *Williams* was a summary affirmance by the Supreme Court without an opinion explaining its reasoning. Thus, we must consider the reach and controlling effect of that summary affirmance. *Mandel v. Bradley*, 432 U.S. 173, 176 (1977); *Hicks v. Miranda*, 422 U.S. 332, 345 n.14 (1975) ("Ascertaining the reach and content of summary actions may itself present issues of real substance.").

A summary affirmance resolves the issues for the parties, and lower courts may not come "to opposite conclusions on the precise issues presented and necessarily decided." *Mandel*, 432 U.S. at 176. But at the same time, "a summary affirmance is an affirmance of the judgment only," not the rationale of the lower court, and "should not be understood as breaking new ground." *Id.* And a summary affirmance "is not to be read as a renunciation . . . of doctrines previously announced in [the Court's] opinions after full argument." *Id.* (quotation marks omitted).

Indeed, "summary affirmances have considerably less precedential value than an opinion on the merits." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 180–81 (1979). And "doctrinal developments" may, in some circumstances, undermine the

31

controlling effect of a summary disposition. *Hicks*, 422 U.S. at 344 (quoting *Port Auth. Bondholders Protective Comm. v. Port of N.Y. Auth.*, 387 F.2d 259, 263 n.3 (2d Cir. 1967)).

So, to assess the controlling effect of *Williams*, we must first identify the "precise issues presented and necessarily decided" in that case. *Mandel*, 432 U.S. at 176. And then, even if the precise issues presented and decided in *Williams* are again presented in this case, we must consider whether doctrinal developments since the *Williams* decision indicate that its controlling influence has waned.

In *Williams*, the district court addressed three claims made by the plaintiffs:

> (1) the intendment of Article II, Section 1, providing for the appointment of electors is that they be chosen in the same manner as Senators and Representatives, that is two at large and the remainder by Congressional or other equal districts; (2) the general ticket method violates the 'one-person, one-vote' principle of the Equal Protection Clause of the Fourteenth Amendment, i.e., the weight of each citizen's vote must be substantially equal to that of every other citizen; and (3) the general ticket system gives a citizen in a State having a larger number of electors than Virginia the opportunity to effectuate by his vote the selection of more electors than can the Virginian.

*Williams*, 288 F. Supp. at 624 (citations omitted) (citing *Wesberry v. Sanders*, 376 U.S. 1, 18 (1964); *Gray v. Sanders*, 372 U.S. 368, 381 (1963)).

Here, Plaintiffs do not argue that South Carolina must allocate electors in the same manner as senators or representatives, nor do they argue that South Carolina's current system somehow affects the weight of Plaintiffs' votes relative to that of voters in other states. And so, we are left to consider what precise issues were necessarily decided in resolving the *Williams* plaintiffs' one person, one vote claim.

A.

To begin, *Williams* did *not* address or resolve any issues related to a claim of vote dilution. In claims of racial vote dilution, "[t]he basic concept, broadly stated, is that racial minorities may not have their group voting power impermissibly 'diluted' by multimember districting or at-large electoral processes which 'submerge' the minority voting group in a voting constituency in which the voting power of a racially 'bloc-voting' white majority always insures defeat for the candidates of the minority group's choice." *McGhee v. Granville County*, 860 F.2d 110, 116 (4th Cir. 1988). The one person, one vote principle at issue in *Williams*, in contrast, implicates the "requirement that all citizens' votes be weighted equally," and usually arises in challenges to disparities in population among districts. *Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections*, 827 F.3d 333, 340 (4th Cir. 2016).

In *Republican Party of North Carolina v. Martin*, this Court concluded that *Wells v. Edwards*, 347 F. Supp. 453 (M.D. La. 1972), *aff'd mem.*, 409 U.S. 1095 (1973)—a summary affirmance of a one person, one vote claim—did not control in a case involving a claim of vote dilution. 980 F.2d 943, 954 (4th Cir. 1992). The same is true here. The *Williams* court's analysis of the one person, one vote argument does not foreclose the vote dilution claim in this case. And moreover, *Williams* could not have "necessarily decided" the "precise issue[ ]" of a vote dilution claim because the doctrine supporting such a claim did not develop in any significant sense until the 1970s, that is, after the *Williams* summary affirmance in January 1969. *Mandel*, 432 U.S. at 176.

33

Although "[t]he question of the constitutional validity of multi-member districts ha[d] been pressed in [the] Court since the first of the modern reapportionment cases," the Supreme Court's first substantial vote dilution case was its 1971 decision in *Whitcomb v. Chavis*. 403 U.S. 124, 142 (1971); *see id.* at 142 n.22 (discussing previous cases in which multi-member districts were involved but where vote dilution claims were not squarely presented). There, the Supreme Court considered a challenge to Indiana's multi-member state legislative districts, holding that multi-member districts are not categorically unconstitutional but that a challenger could show unconstitutional vote dilution by proving "that multi-member districts unconstitutionally operate to dilute or cancel the voting strength of racial or political elements." *Id.* at 144.

Then, two years later, the Court for the first time struck down a multi-member district scheme as an unconstitutional vote dilution. *White v. Regester*, 412 U.S. 755 (1973). The Court concluded that in bringing these types of claims, "it is not enough that the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential." *Id.* at 765–66. Instead, a challenger's "burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." *Id.* at 766. Subsequent cases reaffirmed and refined the doctrine. *See City of Mobile v. Bolden*, 446 U.S. 55 (1980); *Rogers v. Lodge*, 458 U.S. 613 (1982).

And so, the issue of vote dilution was not "presented and necessarily decided" in *Williams* because the *Williams* court had neither the arguments nor the relevant precedent before it. *Mandel*, 432 U.S. at 176. Because *Williams* does not speak to the issue of vote dilution, it does not foreclose Plaintiffs' arguments on that issue.

B.

But even as to Plaintiffs' one person, one vote claim—a claim that alleges that South Carolina unconstitutionally "discards" Plaintiffs' votes after the first stage of the two-stage presidential election—we must take seriously our obligation to ascertain the reach of *Williams*. *See Mandel*, 432 U.S. at 176. Inasmuch as vote dilution claims post-date *Williams*, similarly, the one person, one vote principle has developed significantly since the *Williams* summary affirmance.

This Court has recognized that doctrinal developments—especially decades' worth—can call into question the continued force of summary dispositions. For example, in *Bostic v. Schaefer*, we considered whether the Supreme Court's summary dismissal in *Baker v. Nelson*, 409 U.S. 810 (1972), settled a challenge to Virginia's prohibition on same-sex marriage. 760 F.3d 352, 373 (4th Cir. 2014). We noted that an intervening Supreme Court case—*United States v. Windsor*, 570 U.S. 744 (2013)—had considered a related issue and did not mention *Baker*. *Id.* at 373–74. We said that such an omission "speaks volumes." *Id.* at 374. We then went on to say that "[t]he Court's development of its due process and equal protection jurisprudence in the four decades following *Baker* is even more instructive." *Id.*

35

Accordingly, an understanding of the historical development of the Court's one person, one vote jurisprudence is essential to determining the controlling effect of *Williams*.

In 1946 in *Colegrove v. Green*, the Supreme Court rejected a challenge to Illinois's unequally populated congressional districts. 328 U.S. 549 (1946). Justice Frankfurter's plurality opinion concluded that such a challenge was beyond the competence of the federal judiciary because of its "peculiarly political nature." *Id.* at 552. Although the Constitution "gives ample power to provide against [the] evils" of malapportionment, Justice Frankfurter concluded "[a]uthority for dealing with such problems resides elsewhere"— not with the judiciary. *Id.* at 554. He warned, "Courts ought not to enter this political thicket." *Id.* at 556.

Not even twenty years later, in *Baker v. Carr*, the Supreme Court rejected Justice Frankfurter's conclusion that claims of malapportioned districts that diluted voting strength were beyond the competence of federal courts. 369 U.S. 186 (1962). *Baker* considered a challenge to the malapportionment of the state legislature of Tennessee. Tennessee's legislative districts, like the districts of many other states at the time, did not share equal populations. *Id.* at 319–21 (Frankfurter, J., dissenting). Diverging from *Colegrove*, the Court in *Baker* held that the judiciary was equipped to resolve such a challenge: "Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action." *Id.* at 226 (majority opinion). And so even where, much like the

36

case before us now, previous decisions had been read to condone the state's practice, and

even where many states used a system suffering from the same alleged defect, the Court in

*Baker* remanded the case for consideration on the merits. *Id.* at 237.

Then, in *Gray v. Sanders*, the Court further developed this jurisprudence, using the

phrase "one person, one vote." 372 U.S. 368, 381 (1963). *Gray* involved a challenge to

Georgia's "county unit system" of allocating and counting votes in a state-wide primary.

*Id.* at 370. Each county received a number of votes based on its number of representatives

in the lower house of the state's general assembly. *Id.* at 371. Because the general assembly

was malapportioned, there were significant disparities in the voting power of citizens of

different counties. *Id.* at 370–71 & n.1. The Supreme Court rejected Georgia's justification

of the system based on analogy to the United States Senate or Electoral College. *Id.* at 377–

380. In so doing, the Court characterized the philosophy underlying the Electoral College

as "belong[ing] to a bygone day." *Id.* at 376 n.8. Instead, the Court concluded "once the

class of voters is chosen and their qualifications specified, we see no constitutional way by

which equality of voting power may be evaded." *Id.* at 381. "The conception of political

equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the

Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one

person, one vote." *Id.*

The Court continued to refine the one person, one vote doctrine in subsequent cases.

In *Wesberry v. Sanders*, it held that the one person, one vote, equal population principle

applied to congressional districts. 376 U.S. 1, 18 (1964). In doing so, the Court's majority

rejected the arguments raised in Justice Harlan's dissent, including that the Elections

Clause in Article I, Section 4 gives states the power to prescribe the "Manner" of conducting congressional elections. *See id.* at 23–24 (Harlan, J., dissenting).[4]

And in *Reynolds v. Sims*, the Court held that "as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." 377 U.S. 533, 568 (1964). "Legislators represent people, not trees or acres." *Id.* at 562. And "each citizen [should] have an equally effective voice in the election of members of his state legislature." *Id.* at 565. *Reynolds* therefore marked the expansion of the one person, one vote doctrine from a rule requiring equally populated districts (as in *Baker* and *Gray*), to a theory of equally effective voting power. And *Reynolds* rejected the view that the courts could turn a blind eye to constitutional violations because "a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less." *Id.* at 566.

"Over the ensuing decades, the Court has several times elaborated on the scope of the one-person, one-vote rule." *Evenwel v. Abbott*, 136 S. Ct. 1120, 1124 (2016). For example, after *Reynolds* and after the summary affirmance in *Williams*, the Court clarified that states may deviate from equal population among districts to a greater degree in drawing state and local legislative districts than in drawing congressional districts. *See Brown v. Thomson*, 462 U.S. 835, 842–43 (1983); *see also id.* at 850 n.2 (O'Connor, J., concurring).

---

[4] Justice Harlan's comments in dissent illustrate the significant changes the Court's one person, one vote jurisprudence brought: "I had not expected to witness the day when the Supreme Court of the United States would render a decision which casts grave doubt on the constitutionality of the composition of the House of Representatives. It is not an exaggeration to say that such is the effect of today's decision." *Wesberry*, 376 U.S. at 20 (Harlan, J., dissenting).

And the Court addressed which types of governmental bodies are subject to the doctrine. *See, e.g.*, *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 733–34 (1973) (permitting water storage district board votes to be apportioned based on land value rather than population); *Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50, 52 (1970) (applying one person, one vote to elections for trustees of junior college). And the Court has held the doctrine applies to other democratic processes, like the nominations and selection of presidential electors. *See, e.g.*, *Bush v. Gore*, 531 U.S. 98, 104–05 (2000) (applying one person, one vote to recounting of votes in an election of presidential electors); *Moore v. Ogilvie*, 394 U.S. 814, 819 (1969) (striking down an Illinois law requiring signatures from at least 50 of the state's 102 counties to qualify independent candidates for president).

Thus, in the more than fifty years since the Court's summary affirmance in *Williams*, the Supreme Court has clarified and elaborated on the early one person, one vote cases, particularly in cases moving beyond strict numerical equality of district population and into theories of equally effective voting power. In the same way that this Court in *Bostic* concluded that *Baker* was no longer controlling, the intervening decades of precedent on the one person, one vote principle undermine *Williams*'s controlling effect on that issue. Therefore, we must fully consider each of Plaintiffs' arguments.

Plaintiffs' First Amendment and Voting Rights Act arguments were clearly not raised in *Williams*. And this Court has previously held that a summary decision in a one person, one vote case does not control in a subsequent vote dilution case. *Martin*, 980 F.2d at 954. And because voting rights jurisprudence developed so substantially over the fifty

years between the *Williams* court's consideration of a one person, one vote argument and the Plaintiffs' challenge here, we are not bound by *Williams* with respect to that claim, either.

When courts—like the district court and like our sister circuits who have heard and rejected related cases—fail to seriously consider claims like those raised by Plaintiffs, they risk returning to Justice Frankfurter's approach in *Colegrove*—turning a blind eye to constitutional wrongs out of fear of a political thicket. By stepping away from our responsibility to resolve the questions presented to us, we ignore that *Baker v. Carr* rejected that very approach and ushered in an era of more democratic governance. "When faced with such constitutional wrongs, courts must intervene: 'It is emphatically the province and duty of the judicial department to say what the law is.'" *Rucho v. Common Cause*, 139 S. Ct. 2484, 2525 (2019) (Kagan, J., dissenting) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)).

Judicial abdication in a case such as the one before us causes particularly insidious harm to our democracy. Courts play an essential role in protecting constitutional rights in cases that question allocations of political power. "[T]he courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority." The Federalist No. 78 (Alexander Hamilton).

When those who wield political power use mechanisms of government to entrench and enlarge their power, "politicians' incentives conflict with voters' interests, leaving citizens without any political remedy for their constitutional harms." *Gill v. Whitford*, 138

S. Ct. 1916, 1941 (2018) (Kagan, J., concurring). Members of a legislature may derive personal political benefit from a particular choice of electoral system—for example, members of one party of a state legislature may prefer a system that will favor their party on a national level, thus increasing that party's power and, in turn, increasing their own power. Courts will be, in some instances, the only real avenue for redress.

Accordingly, it undermines our government of and for the people when courts choose to leave unconstitutional electoral mechanisms uncorrected. "The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." *Baker*, 369 U.S. at 217.

## II.

The majority apparently agrees with me that our review is not controlled by *Williams*. Thus, this matter involves considering Plaintiffs' Fourteenth Amendment challenges to South Carolina's state-wide, winner-take-all system of allocating presidential electors.

The parties—and the majority—agree that although the Constitution gives state legislatures power to choose the method of selecting presidential electors, that power is not without limits. It is "always subject to the limitation that [it] may not be exercised in a way that violates other specific provisions of the Constitution." *Williams v. Rhodes*, 393 U.S. 23, 29 (1968). In the election context, the Equal Protection Clause requires that "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104–05. And so, states must "[e]nsure that each person's vote counts as much, insofar as it is

practicable, as any other person's" and protect each person's vote "against dilution or debasement." *Hadley*, 397 U.S. at 54.

Plaintiffs argue their Fourteenth Amendment claim through the lens of vote dilution and through the lens of one person, one vote, as articulated in *Gray v. Sanders*, which Plaintiffs label as a claim of vote "discarding." At this early stage, Plaintiffs' burden is, of course, relatively low. And where Plaintiffs offer "a novel legal theory that can best be assessed after factual development," dismissals at such an early stage are disfavored. *Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015) (internal quotation marks omitted). The complaint must allege facts sufficient to support a plausible claim that South Carolina's state-wide, winner-take-all system violates the Fourteenth Amendment. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For the reasons below, I believe it does.

## A.

Claims of vote dilution allege that members of a minority have had "their group voting power impermissibly 'diluted' by multimember districting or at-large electoral processes which 'submerge' the minority voting group" within a larger majority group. *McGhee*, 860 F.2d at 116. For example, "[a] distinct minority, whether it be a racial, ethnic, economic, or political group, may be unable to elect any representatives in an at-large election, yet may be able to elect several representatives if the political unit is divided into single-member districts." *Rogers*, 458 U.S. at 616; *see also Whitcomb*, 403 U.S. at 143 (noting that the Court has "recogniz[ed] . . . that [multi-member districts] may be subject to challenge where the circumstances of a particular case may 'operate to minimize or

cancel out the voting strength of racial or political elements of the voting population'" (quoting *Fortson v. Dorsey*, 379 U.S. 433, 439 (1965))).

Multi-member districts and at-large systems are not inherently unconstitutional, but they violate the Constitution when they dilute minority votes. *See White*, 412 U.S. at 765; *Whitcomb*, 403 U.S. at 142–43. Generally, if plaintiffs can demonstrate "members [of a group] had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice," then plaintiffs have shown "the political processes leading to nomination and election were not equally open to participation" in violation of the Equal Protection Clause. *White*, 412 U.S. at 766.

Specifically, in the context of state legislatures, the Supreme Court has identified several considerations relevant to the question of whether a minority's votes are impermissibly diluted. The risk of vote dilution "is enhanced when the district is large and elects a substantial proportion of the seats in either house of a bicameral legislature, if it is multi-member for both houses of the legislature or if it lacks provision for at-large candidates running from particular geographical subdistricts." *Whitcomb*, 403 U.S. at 143–44. And in *White v. Regester*, where the Supreme Court affirmed the district court's invalidation of dilutive districts, the Court approvingly discussed the district court's consideration of historical and ongoing racial discrimination and the minority's inability to elect representatives of its choice in the districts at issue. 412 U.S. at 765–70.

Here, South Carolina's system of selecting presidential electors has many of the features that risk creating the vote dilution identified in *Whitcomb*: the "district" from which presidential electors are elected is large (indeed, it is the entire state); every one of

South Carolina's electors is selected through this method; and no electors run from particular geographical subdistricts. *Whitcomb*, 403 U.S. at 143–44.

The "past and present reality, political and otherwise" similarly shows vote dilution. *White*, 412 U.S. at 770. For example, in the 2016 presidential election, 40.67% of South Carolina voters cast their ballots for the Democratic candidate. But despite this support, South Carolina selected *no* Democratic electors.

A similar pattern has occurred in previous elections. In every presidential election since 2000, the Democratic candidate for president received at least 40% of the vote in South Carolina, but South Carolina has selected no Democratic electors. Although the Democratic candidate earns a significant number of votes, none of South Carolina's electors are the electors supporting that candidate.

Plaintiffs allege that here, by submerging their votes in the state-wide total and then allocating electors only on the basis of the state-wide plurality winner, South Carolina has subjected them to arbitrary and disparate treatment and created a system that is not equally open to participation by South Carolina's Democratic voters. This is a viable claim of vote dilution in violation of the Fourteenth Amendment.[5]

---

[5] The parties disagree whether an allegation of invidious intent is required to make out a claim of vote dilution. In *Bolden*, a plurality of the Supreme Court concluded that constitutional claims of vote dilution require proof of invidious intent, not just harmful effects. 446 U.S. at 66 (plurality opinion). But in *Bush v. Gore*, the Court held that equal protection prohibits a state from, through "arbitrary and disparate treatment, valu[ing] one person's vote over that of another." 531 U.S. at 104–05. Plaintiffs argue the *Bush* Court's prohibition on "arbitrary and disparate treatment" removed any requirement of invidious intent. And although South Carolina argues that *Bush* did not abrogate any existing requirement of invidiousness, it takes the position that *either* invidious discrimination *or*

As discussed above, the one person, one vote principle can apply to governmental bodies other than Congress and state legislatures. *See, e.g.*, *Hadley*, 397 U.S. at 52 (applying one person, one vote to elections for trustees of a junior college); *Avery v. Midland County*, 390 U.S. 474, 482 (1968) (applying equal population principle to five-member county commissioners court where the court had administrative, executive, and judicial functions); *Martin*, 980 F.2d at 953 (concluding that the plaintiffs could bring a vote dilution claim challenging the method of electing judges).

In *Avery*, the Court observed that the commissioners court had the "power to make a large number of decisions having a broad range of impacts on all the citizens of the county." 390 U.S. at 483. The function of South Carolina's electors is limited, particularly because South Carolina requires its electors to vote for their declared candidates. *See* S.C. Code Ann. § 7-19-80. But South Carolina's electors nonetheless exercise significant power. The electors express South Carolina's preferences in national presidential elections and they, in fact, cast South Carolina's only constitutionally effective votes for president.

And South Carolina's practices in selecting and allocating its presidential electors affect the nation as a whole. "[I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest. For the President and the Vice

---

arbitrary and disparate treatment of voters can support a one person, one vote challenge. Plaintiffs allege that South Carolina's system arbitrarily treats their votes differently—diminishing as much as 48% support for Democratic candidates into zero presidential electors and magnifying as little as 38% support for Republican candidates into 100% of the state's electors.

President of the United States are the only elected officials who represent all the voters in

the Nation." *Anderson v. Celebrezze*, 460 U.S. 780, 794–95 (1983) (footnote omitted).

To be clear, there is little case law applying the one person, one vote principle to the

selection of presidential electors.[6] And to some degree, the Electoral College is already

"districted" by state by the Constitution. *See* U.S. Const. art. II, § 1, cl. 2. But the Supreme

Court has long held that although the Constitution gives states the power to set the method

for selecting their electors, states may not select a method that violates other constitutional

provisions. *See Chiafalo v. Washington*, No. 19-465, 2020 WL 3633779, at *6 n.4 (U.S.

July 6, 2020) ("A State, for example, cannot select its electors in a way that violates the

Equal Protection Clause."); *Rhodes*, 393 U.S. at 29 ("Nor can it be thought that the power

to select electors could be exercised in such a way as to violate express constitutional

commands that specifically bar States from passing certain kinds of laws.").

And although the Constitution allocates electors on a state-by-state basis—and

permits each state one presidential vote in the House of Representatives in the case of an

Electoral College tie—those allocations predate and are not governed by the Fourteenth

Amendment. *See* U.S. Const. amend. XII. The Fourteenth Amendment requires that *states*,

like South Carolina, afford every "person within [their] jurisdiction the equal protection of

the laws." U.S. Const. amend. XIV. And so the Constitution's allocation of electors *to the*

---

[6] The majority cites *Chiafalo v. Washington*, No. 19-465, 2020 WL 3633779, at *6 (U.S. July 6, 2020) for the proposition that states' authority to determine how to appoint electors includes the authority to require electors to vote for the plurality vote winner in a state. Majority Op. at 16. *Chiafalo* did not consider whether a state-wide winner-take-all system like South Carolina's violates the Equal Protection Clause.

*states* does not mean the states, limited as they are by the Fourteenth Amendment, are free to replicate that allocation on a smaller scale if that system would violate the Equal Protection Clause.

For example, if South Carolina were to allocate its nine electors by district and draw those districts with population disparities that violated the one person, one vote principle, I suspect, and hope, courts would take a constitutional challenge to that system seriously. We should take Plaintiffs' arguments just as seriously, and not excuse unconstitutional vote dilution simply on the basis that the Constitution—prior to the adoption of the Fourteenth Amendment—allocated electors on a state-by-state basis or gave each state one vote in the House following an Electoral College tie.

Because Plaintiffs' allegations make out a plausible claim of vote dilution in violation of the Fourteenth Amendment, I would allow Plaintiffs to proceed in this litigation with this claim.

## B.

Plaintiffs also allege South Carolina's state-wide, winner-take-all system violates the Fourteenth Amendment by discarding their votes before the operative stage of the two-stage presidential election.[7] In support of this position, Plaintiffs rely on the one person, one vote principle, particularly as discussed in *Gray*, *Reynolds*, and *Bush*.

---

[7] South Carolina describes Plaintiffs as "seek[ing] to complicate this case" by describing presidential elections as having two stages. Response Br. at 39. But there is no legitimate disagreement about how presidential elections occur or that there are multiple stages. First, states select presidential electors. U.S. Const. art. II, § 1, cl. 2. Today, every state uses a system in which citizens vote for electors. *Bush*, 531 U.S. at 104. In South Carolina, the

As previously addressed, the principle of one person, one vote does not simply require mathematical equality of population among districts. It "requires . . . that each citizen have an equally effective voice in the election" of government. *Reynolds*, 377 U.S. at 565. And "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* at 555. So South Carolina does not insulate itself from an equal protection claim by merely allowing Plaintiffs to vote in the election for presidential electors. "Equal protection applies as well to the manner of [the franchise's] exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104–05.

Here, Plaintiffs allege that "[t]he consequence of [South Carolina's] system is to give no effect to the votes of citizens who voted for a losing candidate in South Carolina in the tabulation of the final vote for President." J.A. 23–24.[8] "[V]otes for a losing presidential candidate are counted in South Carolina only to be discarded when another candidate wins more votes in South Carolina." J.A. 24.

---

names of electors do not appear on the ballot. S.C. Code Ann. § 7-19-70. Instead, the names of presidential and vice-presidential candidates appear, and "[a] vote for the candidates named on the ballot shall be a vote for the electors of the party by which those candidates were nominated." *Id.* The electors of each state cast their ballots for president and vice president, and if a presidential candidate receives a majority of the electoral votes, he or she is elected president. U.S. Const. amend. XII. Plaintiffs refer to the vote by citizens for electors as the first stage, and the vote by electors for president as the second.

[8] Citations to 'J.A. __' refer to the Joint Appendix filed by the parties in this appeal.

The *Gray* Court identified the problem with South Carolina's state-wide, winner-take-all elections in describing a problem with Georgia's county unit system: "if a candidate won 6,000 of 10,000 votes in a particular county, he would get the entire unit vote, the 4,000 other votes for a different candidate being worth nothing and being counted only for the purpose of being discarded." 372 U.S. at 381 n.12; *see also Gordon v. Lance*, 403 U.S. 1, 4 (1971) (describing *Gray* as holding "that the county-unit system would have been defective even if unit votes were allocated strictly in proportion to population"). In every presidential election since 1980, South Carolinians' votes for Democratic candidates for president have been "counted only for the purpose of being discarded" because, despite representing a significant share of the votes, these votes have translated into no votes in the Electoral College.

South Carolina argues that states have used the winner-take-all system since the first presidential election and that today, 47 other states and the District of Columbia use a similar system. But the first presidential elections in this country were not governed by the Fourteenth Amendment and its Equal Protection Clause, which was not ratified until 1868. And as was demonstrated in *Baker v. Carr*, longstanding or widespread use of a particular election practice does not mean the practice complies with constitutional demands. *See also McGirt v. Oklahoma*, No. 18-9526, 2020 WL 3848063, at *20 (U.S. July 9, 2020) (rejecting an argument that an adverse ruling would be transformative because "the magnitude of a legal wrong is no reason to perpetuate it.").

Hundreds of thousands of South Carolinians vote in each presidential election, only to have their votes disregarded weeks later when South Carolina's electors cast their votes

for president—the only votes that matter for constitutional purposes. Through this system, these South Carolina voters are denied an "equally effective voice in the election" and their votes are not accorded equal value. *Reynolds*, 377 U.S. at 565.

Although this practice has infected generations of presidential elections, I nonetheless believe Plaintiffs have plausibly alleged this system unconstitutionally discards their votes and I would allow Plaintiffs to pursue this claim.

III.

In addition to their Fourteenth Amendment claims, Plaintiffs also claim South Carolina's state-wide, winner-take-all system unconstitutionally burdens their First Amendment rights. Again, *Williams v. Virginia Board of Elections* did not involve a First Amendment claim, and so we must consider this claim on its own terms, without regard to anything we believe the *Williams* court may have thought but left unsaid. Plaintiffs allege South Carolina's system burdens their right to express their political preference, their right to associate, and their right to petition major party candidates. This is sufficient to state a plausible claim of a First Amendment violation, and I do not believe Plaintiffs' claim should be dismissed at this early stage.

"[P]olitical belief and association constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 356 (1976). And the First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010) (internal quotation marks omitted). And of course, the First Amendment protects "the right of individuals to associate for the advancement of political beliefs, and the right

50

of qualified voters, regardless of their political persuasion, to cast their votes effectively."
*Rhodes*, 393 U.S. at 30.

Therefore, "[t]he First Amendment demands judicial scrutiny of state election
regulations because regulations that 'govern[ ] the registration and qualifications of voters,
the selection and eligibility of candidates, or the voting process itself, inevitably affect[ ]—
at least to some degree—the individual's right to vote and his right to associate with others
for political ends.'" *Common Cause v. Rucho,* 318 F. Supp. 3d 777, 926 (M.D.N.C. 2018)
(second and third alterations in original) (quoting *Anderson*, 460 U.S. at 788), *vacated and
remanded with instructions*, 139 S. Ct. 2484; *see also Benisek v. Lamone*, 348 F. Supp. 3d
493, 523 (D. Md. 2018) (majority opinion by Niemeyer, J.) (concluding the plaintiffs had
established associational harms with evidence of "a lack of enthusiasm, indifference to
voting, a sense of disenfranchisement, a sense of disconnection, and confusion"), *vacated
and remanded with instructions sub nom. Rucho v. Common Cause*, 139 S. Ct. 2484.

States may regulate elections, and important regulatory interests generally justify
"reasonable, nondiscriminatory restrictions." *Anderson*, 460 U.S. at 788. But because
election regulations affect important First Amendment interests, courts apply a sliding
scale of scrutiny to state election regulations. *See Burdick v. Takushi*, 504 U.S. 428, 433–
34 (1992). Severe burdens are subject to strict scrutiny and must be narrowly tailored to
serve a compelling state interest; "reasonable, nondiscriminatory restrictions" are subject
to less searching review. *Anderson*, 460 U.S. at 788; *see also Burdick*, 504 U.S. at 433–34.
The Supreme Court has struck down even facially neutral electoral regulations that had the
effect of burdening particular political parties, candidates, or groups of voters. *See,*

*e.g.*, *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 225 (1986) (concluding that a state's enforcement of a statute requiring closed primaries, against the will of the Republican Party, violated the First Amendment); *Anderson*, 460 U.S. at 806 (striking down a state candidate filing deadline because it imposed an unjustified burden on third-party candidates and their supporters, with the "interests of the voters who chose to associate together" for political ends constituting the Court's "primary concern").

In their complaint, Plaintiffs allege South Carolina's state-wide, winner-take-all system burdens their First Amendment rights because their "voices are not heard" in the presidential election. J.A. 28. Generally, "the function of the election process is to winnow out and finally reject all but the chosen candidates." *Burdick*, 504 U.S. at 438 (internal quotation marks omitted). And "[a]ttributing to elections a more generalized expressive function would undermine the ability of States to operate elections fairly and efficiently." *Id.* So the Court has "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls." *Id.* But Plaintiffs do not complain that their political expression is *channeled*; they complain that it is *silenced* because Plaintiffs' votes are discarded before the critical stage of the election.

Plaintiffs also allege their associational rights are burdened because they cannot translate shared principles into "concerted action" and "political power in the community." J.A. 29. As a result of the system, "candidates from major political parties rarely hold campaign events in South Carolina once they are selected by their parties in the primary. This results in a reduced opportunity for all South Carolinians to interface with and petition the candidates for major political parties in person[.]" J.A. 29.

This is a cognizable First Amendment burden. "[D]ifficulties fundraising, registering voters, attracting volunteers, generating support from independents, and recruiting candidates to run for office (not to mention eventually accomplishing their policy objectives)" all implicate the First Amendment. *Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring); *see Anderson*, 460 U.S. at 791 n.12 (concluding that similar harms imposed by a state election law amounted to a "burden imposed on . . . associational rights"); *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011) (describing the right to petition as "allow[ing] citizens to express their ideas, hopes, and concerns to their government and their elected representatives").

The district court concluded that "[P]laintiffs merely allege that the inability of Democratic voters in South Carolina to succeed in having any electoral votes distributed to a Democratic presidential candidate for the past forty years has dampened the likelihood that they will engage in political activity, as it appears useless." *Baten v. McMaster*, 374 F. Supp. 3d 563, 570 (D.S.C. 2019). The district court believed (and the majority appears to agree) that Plaintiffs "conflate[ ] a diminishing motivation to participate with a severe burden on the actual ability of people to participate in the voting process." *Id.* (emphasis omitted). And because "[t]he parties [did] not provide[ ] any cases in which a court has questioned the [winner-take-all] system under a freedom of association theory," the district court dismissed this claim. *Id.* at 571. In my view, that was error.

First, of course, just because a court has not previously addressed the First Amendment implications of a state-wide, winner-take-all system of allocating presidential electors does not mean that such a system cannot create First Amendment burdens. But

second, and more importantly, the district court misunderstood Plaintiffs' allegations. Plaintiffs' allegation that the system burdens their right to petition is that "candidates from major political parties rarely hold campaign events in South Carolina once they are selected by their parties in the primary." J.A. 29. This is not an allegation that Democrats do not come to South Carolina because Democrats are likely to lose. It is an allegation that *all* major party candidates do not come to South Carolina because of the state's winner-take-all system.

And finally, these alleged burdens are not just a result of Plaintiffs' "inability to muster a majority of South Carolina's votes." Majority Op. at 24. Republican candidates have earned all nine of South Carolina's electoral votes with only a plurality of South Carolinians' votes. Democrats in South Carolina may turn out ever increasing numbers of voters for presidential elections, but because of the system South Carolina has chosen, such an increase is unlikely to make any difference in the selection of South Carolina's nine electors.

At a later point in this litigation, a court might measure Plaintiffs' burdens and consider South Carolina's interest in its state-wide, winner-take-all system in light of those burdens. *Anderson*, 460 U.S. at 788. And indeed, at that later point, a court may conclude Plaintiffs have been unable to prove the burdens they allege. *E.g.*, *Gill*, 138 S. Ct. at 1939 (Kagan, J., concurring) (concluding that during the course of the litigation, the "plaintiffs did not sufficiently advance a First Amendment associational theory" to establish standing based on a burden to their associational interests). But they should have an opportunity to develop those claims. Indeed, Plaintiffs' alleged harms have been recognized as First

Amendment burdens before. Yet today the Court affirms the district court's conclusion that Plaintiffs cannot even pursue their claims. I believe that to be a grave error.

Moreover, because Plaintiffs' claims, if allowed to proceed, would eventually be weighed against South Carolina's interest in its state-wide, winner-take-all system, it is worth considering for a moment whether such an interest even exists. South Carolina argues that, even if Plaintiffs have alleged cognizable First Amendment burdens, its interest in exerting the greatest possible influence in the Electoral College justifies those burdens. South Carolina has offered little explanation for how this is a *legitimate* state interest. Burdening some South Carolinians' First Amendment rights so that *other* South Carolinians—those who voted for the presidential candidate garnering a plurality of votes—may speak with more force on a national stage is not, on its face, a legitimate state interest. Accordingly, if Plaintiffs were allowed to pursue their claims, there would be little to weigh their burden against.

Tellingly, South Carolina attaches much authority to the fact that Thomas Jefferson advocated for Virginia to adopt a winner-take-all system for selecting its electors. South Carolina argues Jefferson's "advice sprang from a desire to protect his State against the use of [the] general ticket by other States." Response Br. at 46 (quoting *Williams*, 288 F. Supp. at 626). Jefferson's "advice" to Virginia also gave him a better chance to win the next presidential election, by directing all of Virginia's Electoral College votes to the state's winner—likely to be Jefferson himself. Jefferson even recognized that he had a personal stake in the question, noting that "[p]erhaps it will be thought I ought in delicacy to be

silent on this subject." Letter from Thomas Jefferson to James Monroe (Jan. 12, 1800), available at https://www.loc.gov/item/mtjbib009254.

Thus, some people—people other than the state of South Carolina—do have an interest in South Carolina's state-wide, winner-take-all system. As illustrated by the historical example that South Carolina offers—Jefferson's preference for winner-take-all systems to shore up his Electoral College support—candidates who believe they can win a plurality of votes in South Carolina (and the voters and elected officials who support them) have a strong interest in maintaining this system. But preservation of political power for the people who currently hold power is not a legitimate state interest. And, of course, Jefferson's advocacy for a particular practice does not mean the practice does not offend the Constitution. *See, e.g.*, Extracts from Letter from Thomas Jefferson to Jean Nicolas Démeunier (Apr. 29, 1795), available at http://tjrs.monticello.org/letter/2352#X3184736 (discussing Jefferson's enslavement of "a dozen little boys from 10[ ] to 16[ ] years of age" as nail-makers). Our nation's shared ideas of democracy and equality have evolved from Jefferson's day.

## IV.

Finally, I turn with special concern to Plaintiffs' claim under the Voting Rights Act. Section 2 of the Voting Rights Act prohibits a state from imposing any voting practice that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a). A § 2 violation does not require discriminatory intent. The statute prohibits "voting practices that 'operate, designedly or otherwise,' to deny 'equal access to any phase of the electoral process for minority group

members.'" *United States v. Charleston County*, 365 F.3d 341, 345 (4th Cir. 2004) (quoting S. Rep. No. 97-417, at 28, 30 (1982)).

As the majority recognizes, courts evaluate § 2 vote dilution claims through the familiar framework of *Thornburg v. Gingles*, 478 U.S. 30 (1986). To make out a successful claim, a plaintiff must establish three prerequisites: the minority group must be sufficiently large and geographically compact to constitute a majority in a single member district; the minority group must be politically cohesive; and the white majority must vote sufficiently as a bloc so as usually to defeat the minority's preferred candidate. *Gingles*, 478 U.S. at 50–51; *see also Charleston Cty.*, 365 F. 3d at 345. After a plaintiff establishes the three prerequisites, "the trier of fact must determine whether, based on the totality of the circumstances, there has been a violation of Section 2." *Charleston Cty.*, 365 F.3d at 345.[9]

---

[9] The majority asserts that the *Gingles* prerequisites "do not map onto the type of challenge that the plaintiffs have mounted here." Majority Op. at 27. I disagree and discuss each prerequisite in turn. However, even if Plaintiffs' challenge were not a perfect fit with the *Gingles* prerequisites, that would not mean Plaintiffs cannot make out a § 2 claim. Other frameworks for understanding § 2 exist, most notably the vote-denial framework discussed in *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 239–40 (4th Cir. 2014). A § 2 vote-denial claim requires two elements: first, the challenged practice must impose a discriminatory burden on members of a protected class such that members of the protected class have less opportunity than other members of the electorate to participate in the political process; and second, the burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of that protected class. *Id.* at 240. Moreover, the text of § 2 of the Voting Rights Act is broad and not limited to only those violations that perfectly fit the framework described in *Gingles*. *See id.* at 238 ("Section 2 'prohibits all forms of voting discrimination' that lessen opportunity for minority voters." (quoting *Gingles*, 478 U.S. at 45 n.10)).

A.

As a preliminary matter, the district court seemed to cast doubt on whether the Voting Rights Act applies to the election of presidential electors: "Regardless of whether plaintiffs can meet these three provisions [of *Gingles*], the fact remains that this claim operates on the same premise as their [one person, one vote] claim—that courts should be able to consider the constitutionality of a state's [winner-take-all] electoral college system using the same legal tools and concepts of constitutional fairness that the courts have relied on in assessing state-level voting procedures." *Baten*, 374 F. Supp. 3d at 571. Of course, the Voting Rights Act claim does not challenge the constitutionality of South Carolina's state-wide, winner-take-all system. It brings a statutory claim under the Voting Rights Act. But more importantly, this statement by the district court may be read to suggest the Act does not apply to states' systems of allocating presidential electors. The majority corrects that error, if only implicitly.

And to its credit, South Carolina did not take the position that the Voting Rights Act does not apply to presidential elections in its briefing. However, at oral argument, South Carolina was asked if it took the position that the Voting Rights Act does not apply to presidential elections. South Carolina responded that it "ha[d] not taken that position affirmatively" but described the issue as "certainly an open question." Oral Arg. at 22:16–22:50.

There can be no serious debate over whether the Voting Rights Act applies to presidential elections, and this is not an "open question." For example, the original Voting Rights Act of 1965 provided penalties for anyone who knowingly gave false information

in order to establish his or her eligibility to vote and specified that "this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of *President, Vice President, presidential elector*" or other specified federal office. Pub. L. No. 89-110, § 11(a), 79 Stat. 437, 443 (emphasis added). And the Voting Rights Act Amendments of 1970 included provisions that specifically addressed residency requirements in elections for presidential electors. Pub. L. No. 91-285, § 202(d), 84 Stat. 314, 316–17. Although several states challenged those amendments, the Supreme Court upheld the provisions, recognizing Congress's "prerogative . . . to oversee the conduct of presidential and vice-presidential elections." *Oregon v. Mitchell*, 400 U.S. 112, 124 (1970).

And nothing about § 2 of the Voting Rights Act indicates that it was meant to have a narrower reach than the rest of the Act. Section 2 prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure" to be "imposed or applied by any State or political subdivision in a matter which results in a denial or abridgement of the right" to vote on account of race. 52 U.S.C. § 10301(a). In striking down or enjoining various election procedures under § 2, courts of appeals (including this one) have not differentiated presidential elections or prohibited the challenged practices in all elections other than presidential elections. *See, e.g.*, *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1016 (9th Cir. 2020); *Veasey v. Abbott*, 830 F.3d 216, 268–72 (5th Cir. 2016); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 248–49 (4th Cir. 2014); *see also Hous. Lawyers' Ass'n v. Attorney Gen. of Tex.*, 501 U.S. 419, 425 (1991) ("The term 'representatives' [in § 2] is not a word of limitation."). And the only other district court

59

that considered a Voting Rights Act claim in parallel litigation unambiguously applied the Voting Rights Act to presidential elections. *See League of United Latin Am. Citizens v. Abbott*, 369 F. Supp. 3d 768, 784 (W.D. Tex. 2019) ("As a threshold matter, the Court firmly agrees with Plaintiffs that Section 2 [of] the VRA applies to Presidential Elections."), *aff'd*, 951 F.3d 311 (5th Cir. 2020).

South Carolina's position that it is "certainly an open question" whether the Voting Rights Act applies to presidential elections is concerning. South Carolina must comply with the Voting Rights Act in presidential elections. And if a South Carolina voter brings a claim alleging South Carolina has violated the Voting Rights Act in how it selects presidential electors, the Court has an obligation to hear that claim.

## B.

Turning to Plaintiffs' specific allegations and the question of whether Plaintiffs' Voting Rights Act claim can survive a motion to dismiss, I believe the district court erred. The district court's basis for dismissing this claim was unclear, but it seemed to find that Plaintiffs failed to establish the third *Gingles* prerequisite: that the white majority votes sufficiently as a bloc to usually defeat the minority-preferred candidate. *Baten*, 374 F. Supp. 3d at 571. The district court did not explain this conclusion, and under controlling Fourth Circuit authority, Plaintiffs sufficiently established all three *Gingles* prerequisites. Plaintiffs have therefore stated a plausible claim of a violation of § 2 of the Voting Rights Act and this claim should not have been dismissed.

The first *Gingles* prerequisite requires that Plaintiffs establish that South Carolina's African American population is "sufficiently large and geographically compact to

60

constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. In *United States v. Charleston County*, this Court upheld the district court's conclusion that the plaintiffs had satisfied this prerequisite where African Americans were 34.3% of the population of a 900-square-mile county and where non-white voters represented 30.9% of registered voters in the county. 365 F.3d at 343–44. Based on data from the South Carolina Election Commission, Plaintiffs allege that African American voters made up 27.6% of the registered voters in South Carolina in 2016. African Americans are a majority of the population in the state's Sixth Congressional District, as well as in eight South Carolina counties. And in ten South Carolina counties, African Americans are a majority of registered voters. There are several ways South Carolina's nine presidential electors could be allocated such that African Americans could be the majority in a subdivision of the state. Plaintiffs' allegations are sufficient to establish the first *Gingles* prerequisite.[10]

The second prerequisite requires that Plaintiffs establish that African American voters are "politically cohesive." *Gingles*, 478 U.S. at 51. This Court has previously noted that African American voters in one of South Carolina's most populous counties are politically cohesive. *Charleston Cty.*, 365 F.3d at 347. And in their complaint, Plaintiffs allege that in 2008 and 2016, African American South Carolinians voted for the Democratic presidential candidate at rates of 96% and 94%, respectively. This is sufficient

---

[10] The majority concludes "there is no alternative of a 'single-member district' because the selection of electors in South Carolina does not involve districts at all." Majority Op. at 27. But at-large systems that do not use districts are commonly challenged under the Voting Rights Act. And indeed, the lack of any subdivision of South Carolina's nine electoral votes is the very practice Plaintiffs challenge.

to satisfy the second *Gingles* prerequisite. *Cf. League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 427 (2006) (second prerequisite established where 92% of Latinx voters voted against a candidate).

Finally, the third *Gingles* prerequisite requires that Plaintiffs establish that white voters in South Carolina vote sufficiently as a bloc to usually defeat the minority-preferred candidate. *Gingles*, 478 U.S. at 51.[11] Although the district court concluded that Plaintiffs failed to establish this factor, it offered no analysis as to why the complaint's allegations failed. *Baten*, 374 F. Supp. 3d at 571. This Court has previously noted, in considering this prerequisite, that "[t]he terms used by the *Gingles* Court are 'usually,' 'normally,' and 'generally.'" *Lewis v. Alamance County*, 99 F.3d 600, 606 n.4 (4th Cir. 1996). And although we did not specifically define those terms, we observed, "suffice it to say that they mean something more than just 51%." *Id.*

Plaintiffs allege that, according to census estimates, in 2016 white people accounted for 69.7% of the voting age population in South Carolina. And in exit polls from the 2008 and 2016 presidential elections, "white voters in South Carolina supported the Republican candidate at rates of 73% and 70%, respectively." J.A. 38. In the last ten presidential

---

[11] The majority finds that Plaintiffs' "elide the distinction between the *candidates* the minorities prefer . . . and the 'candidates' that, in their view, they have sufficient political power to elect." Majority Op. at 27–28. But when South Carolina voters go the polls to vote for president, they are, in fact, selecting South Carolina's nine presidential electors. And so, as a general matter, when African American South Carolina voters prefer the Democratic nominees for president and vice president, they prefer the electors who will cast their votes in the Electoral College for those nominees. The "candidates" they support are, therefore, the ones they allege they have political power to elect.

elections, not one of South Carolina's presidential electors has been aligned with the minority-preferred candidate.

South Carolina seems to argue that Plaintiffs must allege that the minority-preferred candidate is defeated *because of* race and not partisan preference, relying on *League of United Latin American Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 853–54 (5th Cir. 1993) (en banc). But in the Fourth Circuit, "[l]egally significant white bloc voting . . . refers to the frequency with which, and not the reason why, whites vote cohesively for candidates who are not backed by minority voters." *Charleston Cty.*, 365 F.3d at 348–49 (quotation marks omitted). Because Plaintiffs sufficiently allege that white bloc voting *usually* defeats the minority-preferred candidate in statewide elections in South Carolina, Plaintiffs have established the third *Gingles* prerequisite.

Although this Court has not explicitly held that allegations establishing the *Gingles* prerequisites are sufficient to survive a motion to dismiss, it is difficult to see how a court could reach a different conclusion. Once the three *Gingles* prerequisites are established, courts evaluate the totality of the circumstances, with special attention to the non-exhaustive list of factors identified in *Gingles*, including: the extent to which members of a protected class are elected; any history of official discrimination in voting practices; discriminatory housing, education, and employment practices; and the existence of racial appeals in campaigning. *Gingles*, 478 U.S. at 38–40; *see id.* at 36–37 (citing S. Rep. No. 97-417, at 28–29 (1982)).

This is, of course, a fact-intensive inquiry. And several of our sister circuits have acknowledged that where a plaintiff establishes the *Gingles* prerequisites, that plaintiff is

likely to succeed under the totality of the circumstances. *See Mo. State Conference of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 930 (8th Cir. 2018); *Sanchez v. Colorado*, 97 F.3d 1303, 1322 (10th Cir. 1996); *Clark v. Calhoun County*, 88 F.3d 1393, 1396 (5th Cir. 1996); *Uno v. City of Holyoke*, 72 F.3d 973, 983 (1st Cir. 1995); *Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994); *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1116 n.6 (3d Cir. 1993) ("[I]t would be a highly unusual case in which a plaintiff successfully proved the existence of the three *Gingles* factors and still failed to establish a violation.").

Here, Plaintiffs sufficiently allege the three *Gingles* prerequisites. And even if we were to consider allegations about the totality of the circumstances at this early stage, Plaintiffs sufficiently make the necessary, plausible allegations. Plaintiffs allege that South Carolina has a history of judicially recognized discriminatory voting practices; there are significant racial disparities in education, employment, health, housing, income, transportation, and incarceration in the state; the racial disparities in these categories indicate a lack of responsiveness to the needs of minority African Americans; there continue to be racially charged campaign and election practices; and voters have elected only one African American to a state-wide office. Given these allegations, it is plausible that South Carolina's state-wide, winner-take-all system violates § 2 of the Voting Rights Act based on the totality of the circumstances.

On appeal, South Carolina argues that Plaintiffs must establish an "undiluted" baseline to state a claim, relying on *Reno v. Bossier Parish School Board*, 520 U.S. 471 (1997). Response Br. at 48, 51. But *Reno* is inapposite. That case involved preclearance

2:18-cv-00510-DCN    Date Filed 07/27/20    Entry Number 44    Page 65 of 65

under the Voting Rights Act; it is simply not relevant to Plaintiffs' burdens at the pleading stage, and cannot be read to impose a requirement on Plaintiffs to offer an undiluted baseline this early in the litigation. *Reno*, 520 U.S. at 477.

Plaintiffs' factual allegations are sufficient to establish the *Gingle*s prerequisites. And even assuming their allegations must show a plausible violation under the totality of the circumstances at this early stage, Plaintiffs have met that burden. The district court erred in dismissing this claim.

## V.

In this case, Plaintiffs challenge a longstanding and widespread method of selecting presidential electors. But the method's ubiquity does not mean it is the best method, or the most democratic method, or even a constitutional method. I would allow Plaintiffs to pursue their claims so that the courts can consider their arguments on a developed record and in light of modern voting rights jurisprudence. That is the legally correct and fair way to address this matter.